## In Equity.

## CAMDEN LAND COMPANY

*vs.*

## WALTER E. LEWIS AND WALTER E. LEWIS, Trustee.

### SAME *vs.* ANNIE F. LEWIS, et als.

### SAME *vs.* ANNIE F. LEWIS, Admx., et als.

### York.    Opinion December 27, 1905.

*Bill in Equity.   Multifariousness.   Enforcible Trust.   Corporations.   Fiduciary Relations of Promoters.   Secret Profits.   Treasury Stock.   Interested Directors. Salaries.   Authority of Corporation President.   Unauthorized Issue of Stock.   Accounting for Sale of Stock.   Ratification.   Trust Funds Changed Into Real Estate.*

1.  A bill in equity which charges (1) that certain real estate was bought for the plaintiff corporation by its president, and was paid for in whole or in part with its funds, or with the proceeds of its stock unlawfully issued and sold, and not properly accounted for, and that its president fraudulently caused the real estate to be conveyed to his son, one of the defendants through whom several other defendants, but not all the defendants, have legal or equitable titles, which they should convey to the plaintiff, (2) that a part of the above defendants, and two other defendants, have unlawfully received stock in the plaintiff corporation, which they should account for to it, and (3) that still another defendant has unlawfully received and sold the stock of the plaintiff, in part, at least, other than that mentioned in the preceding class, for the proceeds of which he should account to it, is bad for multifariousness.

2.  An enforcible trust in lands purchased by the president of a corporation with his own money, or with money which he supposed belonged to him, was not created in this case for the benefit of the corporation, though it had authorized him to act for it in the purchase of real estate, and though he may have intended ultimately to sell the land to the corporation.

3.  Promoters of a corporation stand in a fiduciary relation to the corporation and to its subscribers for stock, and to those who it is expected will afterwards buy stock from the corporation.   If they undertake to sell their own property to the corporation they are bound to disclose the

whole truth respecting it. If they fail to do this, or if they receive secret profits out of the transaction, the corporation may elect to avoid the purchase, or it may hold the promoters accountable for the secret profits.

4. Treasury stock in a corporation which is issued to trustees whose duty is immediately to return it to the corporation is still treasury stock.

5. Directors of a corporation have no authority to act for the corporation in matters in which they themselves are interested.

6. Directors of a corporation cannot vote salaries to themselves. Nor can they vote a salary to one of their number as president at a meeting where his presence is necessary to a quorum. 

7. The president of a corporation has no implied authority to sell its treasury stock. Nor, in the absence of a valid vote of a quorum of disinterested directors can he cause treasury stock to be issued to himself in payment of the corporation's debt to him.

8. The unauthorized issue of treasury stock to the president in such a case conveys no rights to him as against the corporation. He is regarded as holding the stock in trust for the corporation, and if he sells it, the proceeds in his hands are impressed with the same trust, and may be followed into his estate, so long as distinguishable.

9. An officer of a corporation, employed on a salary, to sell its stock for the benefit of the corporation, cannot charge it to himself, or account for it at an arbitrary price, when sold, and pocket the surplus, if any. He must truly account for the whole price received. The whole amount received belongs to the corporation and in his hands is trust money, which the corporation may follow.

10. A vote of stockholders " that all acts of the directors and officers be hereby ratified and approved " is held not to be effective in this case, to ratify the unauthorized and illegal voting of salaries by directors to themselves, or the unauthorized and illegal issue of treasury stock by the president himself, when it does not appear that the stockholders generally had any knowledge of the transactions. Knowledge by stockholders of such transactions is not to be presumed.

11. When trust funds of a personal character have been changed into real estate they can be followed, and the rights of the cestui que trust can be maintained, if the rights of third parties have not intervened.

12. In this case it is *held* that the proceeds of treasury stock unlawfully issued to the president of the plaintiff corporation and sold by him, and the proceeds of treasury stock lawfully issued and sold by him so far as not accounted for, are traced $3,000 into the Sagamore farm, and $1,000 into the Sherman farm, mentioned in the bills, and are charges upon those farms respectively, so far as concerns the interests of such defendants as have no other or greater rights than William D. Lewis would have had, had he purchased those farms in his own name.

In equity. On appeal by plaintiff corporation. Decrees in accordcnae with opinion.

Three suits in equity and heard together on appeal.

The first above named suit is based on the allegation that while the legal title to a certain tract of land in Camden known as the Sagamore farm is in the defendants, the land was purchased for the plaintiff by its president, Wm. D. Lewis, and was paid for with funds of the plaintiff corporation, or with proceeds of stock of the plaintiff corporation unlawfully issued and sold and not properly accounted for. The prayer is for an adjudication that the defendants hold the legal title as trustee for the plaintiff and for a conveyance.

The second above named suit is similar to the first suit but relates to a tract of land in Camden known as the Sherman farm. The allegations and prayer are substantially the same as in the first suit, mutatis mutandis.

In the third above named suit, the original bill was demurred to and the demurrer sustained. The bill was then amended by leave of court. As amended the bill charges that the Sagamore farm named in the first above mentioned suit, the Sherman farm named in the second above mentioned suit were purchased for the plaintiff corporation by its president, Wm. D. Lewis, and were paid for in whole or at least in part by funds of the plaintiff corporation or by proceeds of stock of plaintiff company unlawfully issued and sold, and not properly accounted for. It charges that Walter E. Lewis, Kenneth H. Lewis, Annie F. Lewis, Jessie Lewis, Lenora L. Jackson, Dexter Lewis, Edison Lewis, James M. Jackson, and Walter E. Lewis and Kenneth H. Lewis as Trustees have legal or equitable titles to both tracts which they should convey to the plaintiff. It further charges that Charles H. Lewis, Walter E. Lewis, Annie F. Lewis, Jessie Lewis, Emma J. Call and Florence L. Abbott, have received stock of the plaintiff company unlawfully which they should restore or account for.

The Justice of the first instance decreed that all three bills be dismissed and that one bill of cost be allowed the defendants in each case. Thereupon the plaintiff corporation appealed in each case.

The cases fully appear in the opinion.

*Arthur S. Littlefield and Reuel Robinson,* for plaintiff.

*Joseph E. Moore and J. H. Montgomery,* for defendants.

SITTING:   STROUT, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

SAVAGE, J.   The first bill, dated Nov. 8, 1902, alleges in sub-
stance that on February 26, 1901, one William D. Lewis, president
of the plaintiff corporation, acting for and in behalf of the plaintiff,
contracted for the purchase of a parcel of real estate in Camden,
known as the "Sagamore Farm," and took a written agreement from
the owner to convey the same to Walter E. Lewis "trustee," the
defendant, who was the son of William D. Lewis, upon payment of
the consideration, that afterwards William D. Lewis paid towards the
consideration large sums of the plaintiff's money, or the proceeds of
plaintiff's stock unlawfully issued and sold, and not properly
accounted for, that after the death of William D. Lewis, the defend-
ant, on June 3, 1902, procured a deed of the premises from the
owner, running to himself as "trustee," giving for the unpaid balance
of the consideration his notes as trustee, secured by a mortgage of the
premises, and that the defendant took title as trustee for the plaintiff,
and for no one else.   The prayer is that the defendant may be
adjudged to hold the premises as trustee for the plaintiff, and that he
may be ordered to convey to the plaintiff.

The second bill, dated Nov. 7, 1902, contains similar allegations
and a similar prayer with respect to another parcel of land in Camden,
called the "Sherman Farm," reciting a contract of purchase dated
April 7, 1899, between the owner and W. E. Lewis, but that
W. E. Lewis was acting as trustee, and said Lewis procured a deed
of the same, on Dec. 23, 1901, in accordance with the contract.   It
also alleges that the defendant Lewis, disregarding his trust duty to
the plaintiff, conveyed the premises to one Jackson, and that Jackson
on the same day conveyed them to two of the defendants, in trust for
the benefit of themselves and the other defendants.

The third bill, dated July 21, 1903, alleges in substance, that
prior to 1894 William D. Lewis and Walter E. Lewis owned or
had some interest in sundry pieces of land in Camden and vicinity,
but that prior to June, 1894, they had been divested of title to all,
except a technical right to redeem a part, which right was of no value,
that pretending and representing themselves to own all of said prop-

erty, they undertook to "stock" it, with a design of obtaining for themselves, or for themselves and the other defendants, large amounts of stock in the corporation to be organized, without giving the proposed corporation any equivalent therefor, and with a design to sell the same for their own benefit, in fraud of the corporation, of the organized stockholders who should pay cash for their stock, and of those who should subsequently purchase stock from the corporation; that to carry out such fraudulent design, they organized a corporation under the name of The Camden Land Company, with a capital stock of $360,000, divided into 120,000 shares of the par value of $3 each. It is alleged that William D. Lewis was a director and controlled the corporation, and that two other persons became directors at his solicitation and for his accommodation, and voted as he directed, relying upon his representation that he and Walter E. Lewis still owned, and the corporation was to receive, title to the lands which the Lewises had previously owned, and that each of these other directors subscribed for and paid cash for a few shares of stock. It is further alleged that the directors, under the control and direction of William D. Lewis, and by means of the false and fraudulent representations made by him as to the title to said property, voted, on July 2, 1894, to buy of the Lewises, "all their right, title and interest" in certain specified properties, and to pay therefor 119,900 shares of stock of The Camden Land Company, which was all of its stock except 100 shares subscribed for by the three directors, that the representations as to title were false and fraudulent, of which the stockholders and directors other than William D. Lewis were ignorant. It is alleged that the Lewises received a portion of the 119,900 shares of stock, sold a part of it and retained the proceeds; also that Walter E. Lewis on July 3, 1894, before any of the stock had been issued to him, released to the company 30,000 shares of stock, the same to be for the purpose of the development and expenses of the company. It is further alleged that the Lewises, being the majority stockholders of The Camden Land Company, for their own personal benefit, profit and advantage, that they might have more stock to sell, and in fraud of the plaintiff, and of the parties who have become stockholders therein, and have paid cash for stock,

both at the reorganization, and since, and for the further stocking of the pretended property of The Camden Land Company, on Feb. 10, 1896, organized the plaintiff corporation, with a capital stock of $720,000, divided into 240,000 shares of the par value of $3 each, that said William D. Lewis was a director, that at his solicitation two other persons were made directors, that they each subscribed and paid for 10 shares of stock, and that, relying upon the representations of Lewis, which were false, as to the title and value of the property owned by The Camden Land Company, these other directors, with said Lewis undertook to carry out an arrangement whereby the plaintiff was to issue 239,970 shares of its stock in exchange for the franchise and other property of The Camden Land Company. It is further alleged that The Camden Land Company voted to sell and the plaintiff corporation to buy such franchise and other property, for said 239,970 shares of stock, the plaintiff assuming the debts of The Camden Land Company, and that the plaintiff was induced to make said purchase by the false representations of William D. Lewis as to the title and value of the property of The Camden Land Company. It is also alleged that said Lewis and one Symonds were appointed by The Camden Land Company trustees to receive and distribute the stock of the plaintiff among its stockholders, giving them two shares of new stock for one of the old, that there were then 24,500 shares of treasury stock of the old company unissued, and that said trustees released to the plaintiff 49,000 shares of the new stock, not then issued, to be held as treasury stock. It is also alleged that the plaintiff, through such pretended sale, received no property or interest in any, but that under the direction of said Lewis it issued 191,000 shares of its stock in fraud of the rights of the plaintiff, and of existing stockholders, and future purchasers of stock, and that 35,000 shares of treasury stock have been sold by the plaintiff, and purchased by holders thereof on the faith of and upon a belief in the representations alleged to be false and fraudulent. It is also alleged that the above mentioned 191,000 shares were issued without consideration, and that by direction of said William D. Lewis and Walter E. Lewis, 99,000 of these shares were issued, also without consideration, to certain of these defendants, who were

relatives or members of the family of William D. Lewis, namely, to Walter E. Lewis, son, 20,000 shares; to Annie F. Lewis, wife, 21,000 shares; to Jessie Lewis, daughter, 20,000 shares; to Emma J. Call, sister, 20,000 shares; and to Florence L. Abbott, niece, 19,000 shares. It is also alleged that other shares of the 191,000 were issued under the direction of William D. Lewis, and of Charles H. Lewis, brother of William D., to purchasers, and that they have personally received the pay for the stock so sold to purchasers, and that the stock issued to the parties above named, or to William D. or Walter E. or Charles H. Lewis, or which has been sold by any of them, has been issued or sold in fraud of the plaintiff and of stockholders who were such at the time of the pretended sale by The Camden Land Company, and of subsequent purchasers of treasury stock. It is particularly alleged that defendant Charles H. Lewis has sold and received pay for a large number of the 191,000 shares, from which the plaintiff has received no benefit, and that he has sold and received pay for a large amount of the treasury stock, and has rendered no account therefor.

The third bill also alleges the purchase of the Sagamore farm and the Sherman farm, mentioned in the first and second bills, with the proceeds of portions of the 191,000 shares of stock previously referred to, and the proceeds of said treasury stock, and that the Sagamore farm and the Sherman farm, in fraud of the plaintiff, were conveyed to the defendant, Walter E. Lewis, and are now held by said Lewis and the defendant Kenneth H. Lewis, purporting to be trustees, in specified proportions, for the defendants Annie F. Lewis, Jessie Lewis, Walter E. Lewis, Leonora L. Jackson, Dexter W. Lewis, Edison Lewis and James H. Jackson and Walter E. and Kenneth H. Lewis, trustees, and also, that these farms are now held by the trustees, in fraud of the plaintiff, and without any consideration paid by the trustees, or any of their grantors, grantees in the mesne conveyances, or by the cestuis que trustent, and with full knowledge of all parties of the rights and equities of the plaintiff, so that the property now equitably belongs to the plaintiff. It is also alleged that The Camden Land Company has assigned to the plaintiff all rights which it had at law or in equity, respecting the matters charged,

and that both companies were under the absolute control of William D. Lewis, and of the defendants, while the acts occurred of which complaint is made.  Further it is alleged that the plaintiff has purchased from the true owners portions of the real estate falsely represented to have belonged to the old company, but that it has received no interest in any property from any of the defendants.

The plaintiff alleges that it is entitled to a conveyance of the Sagamore Farm and the Sherman Farm from Walter E. and Kenneth H. Lewis, the trustees, and a release of the interests of the cestuis que trustent, and to an accounting from the defendant Annie F. Lewis as administratrix of the estate of William D. Lewis, and from Charles H. Lewis, Walter E. Lewis, Annie F. Lewis, Jessie Lewis, Emma J. Call and Florence L. Abbott, for all stock held or disposed of by them, or either of them, and makes prayer therefor.

The defendants Annie F. Lewis, Jessie Lewis and Charles H. Lewis, while denying many matters charged, but not necessary now to be specified, deny all allegations of fraud, and also, of any trust for the benefit of the plaintiff or its stockholders.  In their answers, they also claim the benefit of a demurrer.  The other defendants have not answered.  As to this bill it may be observed that while Annie F. Lewis is named among the defendants as administratrix of the estate of William D. Lewis, the death of William D. Lewis is not alleged, and no prayer for relief is made against her in the capacity of administratrix.  The bill, then, charges ( 1 ) that the two farms mentioned were bought for the plaintiff by Wm. D. Lewis, its president, and were paid for in whole or in part with its funds or with the proceeds of its stock unlawfully issued and sold, and not properly accounted for, and that Walter E. Lewis, Kenneth H. Lewis, Annie F. Lewis, Jessie Lewis, Leonora L. Jackson, Dexter Lewis, Edison Lewis, James M. Jackson and Walter E. Lewis and Kenneth H. Lewis as trustees, have legal or equitable titles to both farms, which they should convey to the plaintiff ; (2) that Walter E. Lewis, Annie F. Lewis, Jessie Lewis, Emma J. Call and Florence L. Abbott have unlawfully received stock in the plaintiff corporation, which they should account for to it, and (3) that Charles H. Lewis has unlawfully received and sold the stock of the plaintiff, in part at least, other

than that mentioned in the preceding class, for the proceeds of which he should account to it.

These various allegations, we think, make the bill bad for multifariousness. It is not alleged that the other defendants had any connection with the 99,000 shares of stock received by Walter E. Lewis and others. It is not alleged that any of the other defendants than Charles H. Lewis were in any way interested in the stock sold by him, or connected with the sales by him. It is not alleged that Charles H. Lewis, Emma J. Call and Florence L. Abbott have any connection with the Sagamore and Sherman farms. Here, then, are three different causes of complaint, three prayers for relief, and each in effect against a different group of defendants. One group is to account for the stock received and held, another to account for stock sold, and another to convey land. Nor does the proof show that the situation can be improved by amendment, except by striking out, for the proof shows the same variety of interests and relations. The counsel for the plaintiff urges, as we understand him, that the bill should not be deemed multifarious, because these various complaints grow out of what was virtually a single transaction, namely the fraudulent, unauthorized and void issuing of the stock of the plaintiff at its organization by W. D. Lewis, its president, followed by the unlawful manipulation subsequently of so much of said stock as was treasury stock. We cannot accede to this view. If it should appear that a part of the proceeds of the 99,000 shares spoken of went towards the purchase price of the farms, or if a part of the proceeds of the stock sold by Charles H. Lewis, after being turned into the treasury, went in the same direction, can the plaintiff in one and the same proceeding recover of those who received the 99,000 shares of stock, the value or proceeds thereof, and of Charles H. Lewis the proceeds of stock sold by him, and at the same time enforce against other parties a conveyance of the land on the ground that it was paid for by the proceeds of the same stock? We think not. And all the more this result would follow if the stock was not identical. The complaints made and remedies sought are not only inconsistent but antagonistic. This bill will have to be dismissed.

But a determination of the other two bills involves a consideration

of many of the questions which have been argued with respect to the third bill. There is no doubt that both the Sagamore Farm and the Sherman Farm were paid for in part at least by the proceeds of the sales of stock of the plaintiff, and that the stock sold was in each case stock which was or had been treasury stock, and also stock which had been issued at the outset for the benefit of stockholders in another corporation to pay for property purchased. The plaintiff claims that all of the latter stock was illegally issued, that a portion at least of the former was issued for illegal purposes, and that the proceeds of both classes should be deemed trust funds, which can now be traced into these farms.

In order to have a clearer understanding of the matters in litigation, it is necessary to trace briefly the history of the antecedent corporation, to whose assets, such as they were, and to whose liabilities, the plaintiff has succeeded, though neither the first corporation nor its stockholders, as such, are parties to these bills, nor have they made complaint.

After a painstaking examination of the voluminous record, giving proper weight to the findings of the justice who heard the case below, we think the facts may be summarized substantially as follows. Prior to June, 1894, William D. Lewis, now deceased, and his son, Walter E. Lewis, had acquired some rights and interests in various lots and tracts of land in Camden and Lincolnville, with the idea of disposing of them as sites for summer residences. On June 20, 1894, they organized a corporation called The Camden Land Company, with a view that the corporation should take over their interests in the real estate in exchange for stock. The Camden Land Company (hereafter to be called the old Company) was organized for the express purpose of dealing in real estate. Its capital stock was fixed at $360,000, divided into 120,000 shares of the par value of $3 each. In its organization, William D. Lewis procured the services of William H. Adams, of Boston, and Ralph C. Stephenson, of Kittery, at which latter place the corporation was organized, Lewis and Adams each subscribing for 33 shares, and Stephenson for 34 shares; and they three were elected directors. It is very evident that Adams and Stephenson were in the employ of Lewis, and acting solely by

his direction. It is alleged in one of the bills that they became directors at his solicitation and for his accommodation, and voting as he directed. They were there to represent and act for him, and had no real interest in the corporation or its purposes, otherwise. Although cash appears by the records to have been paid for their shares, under the circumstances we think it should not be found that they paid their own cash. They were what the cases call "nominees" of Lewis, and their stock interests are not to be considered. *Old Dominion Copper Co.* v. *Bigelow,* 188 Mass. 315. At its organization the corporation authorized the directors to purchase such real estate and other property "as they shall be advised are for the best interests of the corporation," and to pay either in cash or the stock of the corporation not exceeding 119,900 shares, which was all of the stock unsubscribed for by the incorporators. On July 2, 1894, the directors (Lewis and Adams being present) voted to buy of the Lewises, all of their rights and interests in certain lots and tracts of land, which were named, and to assume the encumbrance thereon, and to pay them therefor the remaining stock of the company, namely, 119,900 shares. At this time the Lewises had lost their right and title to many of the lots named, and what legal right they had in the other lots was of little or no value. Subsequently, however, during the same year, they succeeded in recovering some interests in the lots forfeited, and conveyed to the company those interests more or less encumbered, but of some value over and above encumbrances, though of far less value than the par value of the 119,900 shares of stock. Of the 119,900 shares to which the Lewises were entitled by the vote, Walter E. Lewis donated back to the company 30,000 shares "for the purposes of development and expenses of the company." So far as the stock voted by the old company for land from the Lewises was issued by the company, it was issued direct to the parties to whom the Lewises sold it. No stock certificate except for the 33 shares subscribed for at the organization was ever issued to either of the Lewises. No certificate was ever issued for the 30,000 shares of treasury stock donated by Walter E. Lewis. It remained in the treasury unissued, except when any was sold, a certificate was issued to the purchaser. Of this 30,000 shares of treasury stock

5,500 shares were sold prior to February, 1896, leaving 24,500 shares unsold. The company at that time had issued certificates for 33,095 shares of other stock, one half directly to purchasers and one half in the name of one S. L. Symonds, and endorsed by him in blank.

In February, 1896, William D. Lewis and others, operating with him, formed the plan of organizing a new company, with a larger capital stock, to be exchanged for the assets of the old company. Their purpose was to get more shares of stock to sell. Accordingly a meeting of the old company was held Feb. 10, 1896. At this meeting, William D. Lewis, S. L. Symonds and Ralph C. Stephenson attended in person. They also held proxies from other stockholders. Symonds was a stockholder, and he had been secretary and treasurer of the old company almost from its organization. At this meeting it was unanimously voted to sell and convey the franchise of the corporation to a new company, to be organized to deal in real estate, with double the capital stock, namely, 240,000 shares, and take in payment 239,970 shares of such stock, provided the new company should assume the debts of the old company. Lewis and Symonds were appointed trustees to receive this new stock of the new company and distribute it among the stockholders of the old company, giving two shares of the new for one of the old.

On the same day and at the same place, Lewis, Symonds and Stephenson, who composed the meeting of the old company and passed the vote above named, organized, in accordance with prior notices, a corporation to deal in real estate and stocks, to be known as Camden Land Company, (hereinafter to be called the new company) with 240,000 shares of stock, at a par value of $3 each. The three incorporators were elected directors, and were authorized to purchase such real estate and other property "as they shall be advised are for the best interests of the corporation," and to issue stock in payment thereof, not exceeding "239,900" shares. The incorporators subscribed for 10 shares each, which, so the records state, were paid for. Lewis was made president, Symonds secretary and treasurer of the new company. The next day, Feb. 11, 1896, the directors (Lewis and Symonds, only, being present) voted "to buy of The Camden Land Company their franchise and all their property, of whatever

name and of whatever nature, and wherever located, including real estate in Camden and Lincolnville, Maine, containing about 850 acres of land bonded and subject to the following claims, which the Camden Land Company hereby assume," (four claims were specified), and pay therefor 239,970 shares of the capital stock of Camden Land Company. At a stockholders' meeting, held May 6, 1896, at which were present in person W. D. Lewis, S. L. Symonds and R. C. Stephenson, and other stockholders were represented by proxy, the acts of the directors under the vote of Feb. 11, above stated, were approved. And further, at a stockholders' meeting held May 7, 1902, there being present in person or by proxy holders of 190,580 shares of stock, it was "unanimously voted that all acts of the directors and officers be hereby ratified and approved."

Symonds, the treasurer of the new company, immediately after the directors' vote above named charged off on the books of the new company all its capital stock, 30 shares to the incorporators, according to their subscriptions, and the remaining 239,970 shares to Lewis and Symonds, trustees for the stockholders of the old company. All the assets and rights of the old company were subsequently transferred to the new company. The old company did possess some real estate which the new company acquired, but it was less in quantity and and value than appeared in the treasurer's report of the old company, or was represented to purchasing stockholders in the new company, and very much less in value than the par of the stock given in exchange.

The plaintiff claims that the votes of Symonds, as stockholder and director in the new company, to exchange the stock of the new company for the assets of the old, were made on the strength of the representations of Lewis, which turned out to be false, in regard to the ownership of the various tracts of land which the old company had voted to buy of the Lewises. But we think that the presiding justice below was well warranted in finding that if the representations of Lewis were made as claimed, and if Symonds believed them to be true, they were not the cause of his vote. That is to say, he did not make the vote on the strength of those representations. Symonds was part and parcel of the new scheme for "restocking" the lands

and property of The Camden Land Company; and we think, to quote the language of the presiding justice, that "he was hand in glove with Lewis, working in concert with him to obtain more stock to sell, and voted as he did for that purpose."

If the foregoing transactions were valid and effective, the new company now had no stock unissued. Lewis, Symonds and Stephenson, being all the stockholders in the new company, and also its directors, had voted, as stockholders, to authorize the directors to purchase real estate and give in payment therefor 239,900 shares of its stock. The directors had voted to buy the assets of the old company for 239,970 shares of stock, 70 shares more than was named in the stockholders' vote; but the directors' vote was afterwards ratified by the stockholders. All the shares had been disposed of by unanimous consent of all the stockholders, 30 shares to them as incorporators, and the remainder to trustees for stockholders of the old company. The stock all belonged to Lewis, Symonds and Stephenson, incorporators, and to Lewis and Symonds, trustees, and was entered on the books accordingly. The new company still has the property conveyed to it by the old company in exchange for this stock. It has never sought to rescind the contract of purchase, and does not now seek to.

But after all of the stock of the new company had been disposed of, so far as book account is concerned, as previously stated, Lewis and Symonds, as trustees, transferred to the treasurer of the new company 49,000 shares of stock, which was two shares for one of the treasury stock remaining in the treasury of the old corporation. This stock, although it had been issued to Lewis and Symonds as trustees, is to be regarded as treasury stock. When this was done the new company had as assets the agreement of the old company to convey its lands and rights, which was afterwards carried out, and had upon its books the 49,000 shares of its own stock thus transferred to it. There were left in the hands of Lewis and Symonds, trustees for the stockholders in the old company, 190,970 shares. Of the 49,000 shares of treasury stock, 35,000 shares have been disposed of and issued, and all have been accounted for to the company in one way or another. Some have been sold by the president and by the general manager at varying prices, $1 a share and

upwards, but have been accounted for to the company, so far as book keeping goes, at $1 a share. The cash proceeds have been used by the company in its business. Some shares have been transferred to the president on account of salary and expenses. Out of the shares remaining after the 49,000 shares of treasury stock were returned to the company, allotments were made by Lewis and Symonds, trustees, to Charles H. Lewis, Walter E. Lewis and others of the Lewis family. Some or all of these shares have since been sold by Charles H. Lewis upon the market. Charles H. Lewis was general manager of the new company, and also made sales for it out of the 49,000 shares of its treasury stock.

By far the greater portion of the proceeds of sales of stock were consumed in expenses of officers and agents, and in paying salaries to the officers and to the general manager, Charles H. Lewis. These salaries, however, were fixed by the votes of the directors. The plaintiff claims that these salaries were unlawfully voted at directors' meetings attended only by William D. Lewis and S. L. Symonds, who, by their interest, were disqualified from voting on the question. The salaries to Lewis and Symonds were voted at such meetings.

As already stated, one ground on which the plaintiff asks that the Sagamore and Sherman farms be declared to be held in trust for its benefit and for a conveyance is that the funds of the plaintiff, or funds derived from the sale of its stock, were used to pay for both of these farms. It is undoubtedly true that a large part of the money paid for these farms came from the sales of stock in the plaintiff company. But with two exceptions to be noticed, all the proceeds of stock which went into these farms arose from the sales of stock originally held in trust by Lewis and Symonds for the benefit of the stockholders of the old company, and outside of the 49,000 shares of treasury stock.

Out of the 49,000 shares of treasury stock, 5500 shares were transferred to W. D. Lewis on account of salary and expenses. 5,000 shares of this Lewis stock were sold by him to Edwin Lord for 5,000 in cash and other considerations, probably of little value, and the other 500 shares were left with Lord to be sold by him for the joint benefit of Lewis and himself. Of the $5,000 received from

Lord, Lewis paid $3,000 towards the purchase of the Sagamore farm, March 28, 1901.

One George A. Bigelow purchased 2,000 shares of the treasury stock at $1.50 a share, for which he gave to W. D. Lewis two notes payable to the plaintiff for $1,500 each. This stock was accounted for by Lewis to the company at $1.00 a share, the company taking, in part at least, other notes, derived from the sale of other stock. W. D. Lewis turned in one of Bigelow's $1,500 notes towards the purhase of the Sherman farm, and it was afterwards paid. The effect of these two payments out of the Lord purchase and the Bigelow purchase we shall consider hereafter.

The plaintiff also claims that the Sagamore and Sherman farms should be conveyed to it, because it says that the farms were bought for it; that W. D. Lewis, in making the original agreements for purchase, was then acting as its officer and agent. It appears that at a meeting of the stockholders held May 10, 1897, Lewis was "authorized and empowered to act for the company in the purchase of real estate." No specific authority or instruction was given to him with regard to any particular parcel of real estate, and so far as appears, neither the corporation nor the directors directed him specifically to make contracts for the Sagamore farm or the Sherman farm. In 1898 W. D. Lewis secured an option, or agreement to sell, on the Sherman farm in the name of his son, William E. Lewis. In 1901 he secured a similar option on the Sagamore farm in the name of W. E. Lewis, trustee, the purpose of the trust not appearing in the writing. We have no doubt that at the beginning of the negotiations and during the greater part of the time after the owners agreed to sell, and until the deeds were given, Lewis intended that these farms should go to the complainant eventually. All the payments, however, were made by him out of his own funds, or at least out of funds which he thought belonged to him. He charged none of his payments to the company. The company never became bound to purchase either farm, or to repay Lewis for his disbursements. Before the deeds were obtained, and at a time when it was exceedingly doubtful whether the Lewises would be able to complete the payments, a new trust was formed. Money was raised from persons who had

had nothing whatever to do with the previous transactions with the company, or its stock, and with it was paid a balance due on the purchase of each farm, and interest.  And thereupon the farms, by mesne conveyances, were placed in trust for the benefit of members of the families of W. D. Lewis and Charles H. Lewis, whose money had gone in to make the prior payments, and for the benefit of the persons contributing later to complete the payments.  Among these persons were directors of the plaintiff company other than the Lewises, including Symonds, who now seems to complain of the transaction.

Upon a careful study of the evidence, we are unable to find that any enforcible trust is established in favor of the plaintiff, in either farm, by reason of the fact that they were purchased by the president of the company.  Whatever may have been his intention, it was not carried into effect.  It did not proceed so far as to make it a trust binding upon himself, or which the company was bound to recognize, or which it might enforce.  There was no declaration of an express trust in these farms for the benefit of the plaintiff.  There were no fiduciary or confidential relations between Lewis and the company with respect to these farms out of which a constructive implied trust might arise from the fact that he made the purchase.  He had a right to buy the farms for himself, and afterwards to sell them to the company.  His intention to do so did not make them trust property. Even if he had agreed to buy them for the company, but had repudiated the agreement and purchased them in his own name, with his own money, the great weight of authority is to the effect that the agreement would be within the statute of frauds and not enforcible, if not in writing.  15 Am. & Eng. Ency. of Law, p. 1187, and cases cited.

The only remaining question is whether these farms were paid for in whole or in part, with the funds of the plaintiff, and under such circumstances that an implied or resulting trust would arise, or, failing that, whether money of the plaintiff, which was in the hands of William D. Lewis, and which is to be regarded as trust funds, was paid as the consideration, in whole or in part for the purchase of the farms, and if the answer upon the latter hypothesis is in the affirmative, whether the fund can be regarded as so traced into the farms as to make them trust property, or as to make them liable to be charged in equity with the payment of the fund.

To present the issue sharply, it must be said that under the first and second bills, the question is not what liabilities the promoters of the old company are under to that company for secret profits growing out of their sale to the company, or an account of their failure to disclose to existing or future stockholders the truth respecting the title or cost of the lands bought. The old company is not seeking relief. Nor is it a question how far the promoters of the new company are responsible to it for matters growing out of the sale from the old to the new company, or for profits received by them in the sale of the new stock, which was given them for their old stock.

It may be conceded, for it is well settled and true, that promoters of a corporation stand in a fiduciary relation to the corporation, and to its subscribers for stock, and to those who it is expected will afterwards buy stock from the corporation. The promoters owe to them the utmost good faith. And if they undertake to sell their own property to the corporation they are bound to disclose the whole truth respecting it. If they fail to do this, or if they receive secret profits out of the transaction, either in cash or by way of allotments of stock, when there are other stockholders, or it is expected that there will be other holders of new and additional stock, undoubtedly the corporation may elect to avoid the purchase; or it may hold the promoters accountable for the secret profits, if in cash; or may require a return of the stock if unsold; or if sold, an accounting for the profits of its sale. *Hayward* v. *Leeson*, 176 Mass. 310, and cases cited; 3 Thomp. on Corp. p. 2927; *Plaquemines Tropical Fruit Co.* v. *Buck*, 52 N. J. Eq. 230; *Old Dominion Copper Co., etc.* v. *Bigelow*, 188 Mass. 315. But here the plaintiff corporation does not seek to avoid the sale. It retains the property purchased. So far as the Sagamore and Sherman farms are concerned, it does not seek, and cannot seek, an accounting for promoters' profits. For these reasons we do not need to inquire whether the plaintiff might have avoided the sale from the old company, on the ground that its promoters were stockholders in the old company, and therefore that they were buyers and sellers in the same transaction. Nor are we concerned now with the question whether the promoters or directors are liable to those who purchased of them or of the company, for false

representations with respect to the amount or value of the corporate property, or other material matters.

The real question involves only the character and ownership of the funds which went to pay for the Sagamore and Sherman farms. These funds, so far as concerns this case, were derived entirely from the sales of stock in the plaintiff corporation. It appears that all of the stock, excepting the shares subscribed for by the incorporators or promoters, was issued to Lewis and Symonds in trust for the benefit of the old stockholders, to be distributed by them, two shares for one. But there were no old stockholders for 24,500 shares, which was treasury stock of the old company. Lewis and Symonds, accordingly held 191,000 shares of stock in trust for actual stockholders of the old company, and 49,000 shares to represent the equivalent of the treasury stock in the old company. We have already said that we think these 49,000 shares must be regarded as treasury stock. We can see no difference in allowing them on the one hand to remain in the treasury in the first place, or on the other, issuing them to trustees whose duty it would be to immediately cover them back into the treasury. Up to this point we see nothing of which the plaintiff corporation can find fault. The whole course of procedure between the two companies, so far, has simply resulted in the organization of a new company, with the same stockholders, owning the same property, but capitalized at twice the amount. It was in effect a reorganization. Nothing relating to the exchange, so far, was concealed from the new company or its stockholders. It was understood that they were buying the assets of the old company, whatever they were. When the exchange was effected, they were not wronged and the company was not wronged. The stockholders had just as much as they had before, no more, no less. Lewis and Symonds, the trustees to whom the stock was issued, held it not as trustees for the plaintiff, but as trustees for the old stockholders. The old stockholders were entitled to the stock. They could sell it. No trust attached to it in their hands for the benefit of the new company, nor to proceeds of sales by them. The payments for these two farms, with the exception of a single item in each case, were made out of the proceeds of sales of the 191,000 shares of stock which belonged

to stockholders, and the conclusion at which we have arrived eliminates them from further consideration. We do not wish to be understood as saying that, if the purchase by the new company of the old had been effected upon the strength of false representations by the promoters of the new, or if they had received secret profits out of the transaction, the plaintiff would have been remediless. But we do not think that the representations of Lewis were in any degree a moving consideration for the transfer.

In the case of the Sagamore farm, as we have seen, a $3,000 payment was made out of the proceeds of stock sold by W. D. Lewis to Edwin Lord. This stock had been treasury stock; but sometime prior to the sale to Lord it had been transferred to Lewis as part payment of debts owed to him by the corporation. These debts consisted of salary as president and expenses credited to him on the books of the corporation. The salary was voted at a meeting of the directors, at which only he and Symonds were present, when each was voted a salary. It is contended that such a vote was unauthorized. We think so. Directors have no authority to act for the corporation in matters in which they themselves are interested. They owe their whole duty to the corporation, and they are not to be permitted to act when duty conflicts with interest. They cannot serve themselves and the corporation at the same time. *E. & N. A. Ry. Co.* v. *Poor*, 59 Maine, 277. For the same reason, directors cannot vote salaries to themselves. Nor can they vote a salary to one of their number as president or secretary or treasurer, at a meeting where his presence is necessary to a quorum. And such votes, if passed, are voidable by the corporation, and if money has been paid it may be recovered back. *Kelley* v. *Newburyport St. Ry. Co.*, 141 Mass. 496; *Barnes* v. *Brown*, 80 N. Y. 527; *Gridley* v. *Railroad Co.*, 71 Ill. 200; *McNulta* v. *Corn Belt Bank*, 164 Ill. 427; 56 Am. St. Rep. 203; *Jones* v. *Morrison*, 31 Minn. 140; 21 Am. & Eng. Ency. 877, 899, 910; 10 Cyc. 777, 790, 809; 2 Cook on Stockholders, sect. 657.

In this situation of the accounts, Lewis procured the transfer to himself of 5,500 shares of treasury stock, and charged himself with it at $1 a share. The plaintiff questions the lawfulness of that transfer, even assuming Lewis's account to be valid. It is well set-

tled that an officer cannot apply corporate property in his possession to the payment of a debt due to himself from the corporation, without the authority of the directors, and the corporation may require a return of the property thus appropriated. *Emporium Real Estate etc. Co.* v. *Emrie,* 54 Ill. 345 ; *Greenville Gas Co.* v. *Reis,* 54 Ohio St. 549 ; 21 Am. & Eng. Ency. 911 ; 10 Cyc. 799. No more, we think, can an officer pay himself with treasury stock, without the authority of the directors. While it is true that the president or general manager of a corporation sometimes exercises quite extensive powers in the executive management of its business, he is nevertheless, acting all the time under the express or implied authority of the directors, who are the real managers of the corporation. He has no implied authority to sell treasury stock. *Matter of Utica Nat. Brewing Company,* 154 N. Y. 268. And in the absence of any vote of the directors (and there is none in this case) authorizing the president of a corporation to have issued to himself stock on account of the corporation's debt to him, we think he has no such authority. Even if he may be authorized to sell stock, no authority to take it in payment of his own account can be implied from this fact. To sell stock, and to apply it on the selling agent's own debt, are two different things. His authority to take the stock of the company in payment of his debt cannot be implied from the fact that he may have the general executive management of the corporation. No doubt a vote of disinterested directors, in a meeting where the interested director's presence is not necessary to a quorum, would be sufficient authority for such action. But in this case there was no such meeting, and there was no such vote. Lewis appears to have acted solely on his own responsibility, and handled the stock as if no one else had any interest in it. It is true that Symonds, a director, knew of the transfer and probably assented to it. But that was not enough. Directors must act as a board. *Peirce* v. *Morse-Oliver Building Co.,* 94 Maine, 406; 10 Cyc. 775, and cases cited ; 21 Am. & Eng. Ency. 864. There was no such act in this case. Two of the three directors knew and assented, but one of those two was disqualified to act by his interest. The issue of shares, without authority of the directors, conveys no rights as against the corpora-

tion, in the absence of an estoppel, in favor of one who is not a purchaser of them in good faith and for value. *Ryder* v. *Bushwick R. Co.*, 134 N. Y. 83. Lewis could not well play the role of an innocent purchaser. The stock, when issued to him, in equity was not his. The corporation might require its return. He, therefore, held it in trust for the corporation. And the proceeds of that stock sold by him were impressed with the same trust, and may be followed so long as distinguishable; or Lewis's estate may be held accountable for them. $3,000 of the proceeds are traced into the Sagamore farm.

As to the Sherman farm it appears unmistakably, we think, that on May 1, 1899, W. D. Lewis, president of the plaintiff, sold 2,000 shares of treasury stock to George A. Bigelow, at $1.50 a share, for which Bigelow gave his two notes of $1,500 each, payable to the company, one of which Lewis turned in towards the purchase price of the Sherman farm. Lewis, on account of this transaction, transferred to the company other notes for $2,000, leaving $1,000 unaccounted for, apparently. It seems to have been the practice of both Lewises to account for the stock of the company which they took and sold, at $1.00 per share, regardless of the price actually received. And we think Lewis in this instance undertook to account fully for the 2,000 shares of treasury stock by the notes for $2,000 which he turned in to the company. Although the accounting must be held good for $2,000, we do not think it was sufficient. When an officer of a corporation, on a salary, is employed to sell its treasury stock for the benefit of the corporation, he cannot speculate in it for his own benefit. He cannot, without the consent of the corporation or directors, lawfully obtained, charge it to himself, or account for it at an arbitrary price, and pocket the surplus of proceeds, if any, over and above the arbitrary price at which he charges it. He must truly account to the corporation for the whole price received from purchasers. The money in his hands belongs to the corporation for the whole price received from purchasers. The money in his hands belongs to the corporation, and is therefore trust money. Lewis, then, after accounting for $2,000 of the $3,000 received, still had in his hands $1,000 trust funds belonging to the plaintiff. This was represented by the $1,500 note, or by part of the amount due on the

note of Bigelow, which he held. That note he turned in towards the purchase of the Sherman farm, and it was afterwards paid by Bigelow.

There is some evidence that it was understood at the time by Lewis that this $1,000 did not belong to the company; but we think it did, until properly accounted for. The burden of accounting for it is upon the defendants and the accounting which they attempt is not satisfactory.

But the defendants say that the acts of Lewis as president, and of Lewis and Symonds, as directors, have been ratified by votes of the plaintiff's stockholders, and that the ratification validates all unauthorized acts, that is, all acts done without or in excess of authority. It is unquestioned that a corporation may ratify the unauthorized acts of its officers and directors, if they are within the powers of the corporation, and make them as valid as if antecedent authority had existed for doing them. This may be done by a vote of the stockholders, and is sometimes inferred from long acquiescence. Such a ratification might validate an unauthorized or irregular issue of stock to a president in payment of a salary which had been voted to him at a board meeting when his presence was necessary to a quorum. It might validate an accounting which an officer had made for treasury stock sold by him.

It appears in the case, as already stated, that at a meeting of the stockholders held May 6, 1896, the acts of the directors under the vote of the preceding February 11, were approved. This undoubtedly related to the exchange of its stock for the assets of the old company. This matter we have already disposed of. But the other ratification of May 7, 1902, whereby the stockholders "unanimously voted that all acts of the directors and officers be hereby ratified and approved" is open to consideration. It is urged that this ratification should not be held to effect the rights of the plaintiff in this case for two reasons. First, that the ratification was passed by the votes of stock owned or controlled by Lewis, whose unauthorized acts as director and president it was intended to cure; and secondly, that the ratification was voted in ignorance of facts now discovered, and which are relied on to show that the payments of $3,000 and $1,000 above referred to were made with trust funds. It is claimed that if a director is dis-

qualified from voting a salary to himself, or from paying himself by the issue of stock, he should be for the same reasons disqualified as a stockholder from voting to ratify such acts, and that to hold otherwise would be to say that when a director owns a controlling interest in the stock, the minority stockholders are remediless against his unlawful acts as director. It may be an open question yet, whether a ratification of the unauthorized acts of a director, in his own interest, is effective when voted by stock owned or controlled by him, and whether he is entitled to vote at a stockholders' meeting to ratify a contract made by himself. See *Pender* v. *Lushington*, 6 Ch. D. 70; the case of *Beatty* v. *North Western Transportation Co.* in its several phases, in 6 Ont. Ch. D. 300 (6 Am. & Eng. Corp. Cases, 315); 12 App. Cases, 589; 11 Ont. App. 205 (10 Am. & Eng. Corp. Cases, 263); 12 Sup. Court of Canada, 598, (19 Am. & Eng. Corp. Cases, 171); the vigorous protest of the author in 4 Thompson on Corporations sect. 4461; *Gamble* v. *Queens County Water Co.*, 123 N. Y. 91; *Bjorngaard* v. *Goodhue County Bank*, 49 Minn. 483; *McNulta* v. *Corn Belt Bank*, 164 Ill. 203. There is no doubt that the arm of the court in equity is long enough to reach and undo any such ratification which appears to be fraudulent as against the minority stockholders, and that the court will interfere when such action by the stockholders is so detrimental to the interests of the corporation itself as to lead to the necessary inference that the interests of the majority stockholders lie wholly outside of and in opposition to the interests of the corporation and of the minority of the shareholders, and that their action is a wanton or fraudulent destruction of the rights of such minority. See *Gamble* v. *Water Co.*; *Bjorngaard* v. *Bank*, and on 4 Thomp. Corp. all cited above.

But it is unnecessary to consider this question further here, for it does not appear that the ratification was carried by stock owned or controlled by Lewis. Undoubtedly a great majority of the stock represented at that meeting was friendly to the Lewis interests, and, in the cleavage of sentiment which had begun to appear then among the stockholders, for and against Lewis, took the side of Lewis. But on the question of ratification the vote was unanimous.

The remaining objection to the ratification is, we think, well taken.

It is common legal knowledge that one cannot be said to ratify that which he does not know. *Marcoux* v. *Society St. John Baptist*, 91 Maine, 250; *Whalen* v. *Equitable Accident Co.*, 99 Maine, 231. The burden is on him who relies upon a ratification to show that it was a binding ratification, that is to say, that it was made with a full knowledge of all the material facts. 21 Am. & Eng. Ency. 901; 10 Cyc. 1079. The resolution of ratification was both broad and indefinite. No single act is referred to. There is no pretense that the stockholders outside of the Lewises and Symonds had any knowledge of the transactions now complained of. Nor is knowledge to be presumed from the fact that the transactions appeared in the records and books of the corporation. Means of knowledge is not knowledge in such case. It is not to be expected, and it is not true generally, that the stockholders in meeting assembled, know what is contained in the records of directors' meetings, or in the books of account. *Murray* v. *Nelson Lumber Co.*, 143 Mass. 250; *Pacific Rolling Mill* v. *Dayton etc. Railway Co.*, 5 Fed. Rep. 852; *Allen* v. *American Building and Loan Asso.*, 49 Minn. 544; *First Nat. Bank of Fort Scott* v. *Drake*, 29 Kans. 311; 10 Cyc. 1079, and cases cited. The ratification relied upon cannot, therefore, be sustained.

We have already said that, in the absence of ratification, the $3,000 and $1,000 items are to be deemed trust funds. Can they be followed into the Sagamore and Sherman farms, respectively? We think they can. They certainly have been traced into them. The plaintiff's right does not arise from an express trust, or from a resulting trust, but because the money which went into the farms was itself trust money. If so they are to be charged with the trust. The authorities are numerous that when trust funds of a personal character are changed into real estate, or are invested in real estate, they can be followed, and the rights of the beneficiaries maintained, if the rights of third parties have not intervened. *Cobb* v. *Knight*, 74 Maine, 253; 28 Am. & Eng. Ency. 1110. The rule is that when all of the substituted property is paid for by the trust property, the cestui que trust may elect to take the property. But that rule does not apply in a case like this. The farms were not originally purchased with these trust funds. The payment from the trust fund

in each case was only one of many payments. Equity requires that the plaintiff should get the benefit of its funds, and that they should be a charge respectively upon the two farms; but not as we shall show upon the entire present interests in the farms. We cannot give the relief specifically prayed for, but we can give other relief, and the only relief the case is susceptible of. We cannot order a conveyance of all the interests in the farms, but we may order a sale of the interests affected by the trusts.

Although William D. Lewis procured the contracts for the sales of these farms in the name of his son, W. E. Lewis, we are satisfied that the entire beneficial interest was in the father. Subsequently W. E. Lewis obtained deeds of the farms and gave mortgages for the unpaid parts of the purchase price. But he held in trust. In fact we are unable to distinguish any interest in W. E. Lewis apart from that of his father. It certainly has not been made to appear. While matters were in this condition, doubt arose whether W. E. Lewis would be able to complete the payments, and a new arrangement was made, whereby W. E. Lewis conveyed the farms to one George W. Jackson, and Jackson to W. E. Lewis and Kenneth H. Lewis in trust for certain parties in certain proportions, namely, Annie F. Lewis, 8-64; Jessie Lewis, 8-64; W. E. Lewis, 8-64; Leonora L. Jackson, 7-64; Dexter W. Lewis, 7-64; Edison Lewis, 7-64; Kenneth H. Lewis, 7-64; James W. Jackson, 8-64; W. E. and Kenneth H. Lewis, trustees for S. L. Symonds, 4-64. All these except Jackson and Symonds were the widow and children of William D. Lewis and the children of Charles H. Lewis. So far as this widow and these children (except Kenneth) are concerned, the conveyance of the Sherman farm was voluntary and without consideration. They have no greater or other rights than William D. Lewis would have had. And the same is true of the interest of W. E. Lewis in the Sagamore farm. But J. M. Jackson, S. L. Symonds and Kenneth H. Lewis contributed respectively $1,500, $800 and $700 towards the payments on the farms. This was a part of the new trust arrangement. Their interests are entitled to protection. The trust funds traced into the Sherman farm, therefore, should be a charge only upon the interests, under the trust deed of

that farm to W. E. and Kenneth H. Lewis, of Annie F. Lewis, Jessie Lewis, W. E. Lewis, Lenora L. Jackson, Dexter W. Lewis and Edison Lewis. And the trust funds traced into the Sagamore farm should be a charge, as the first bill is at present constructed, only upon the interest of W. E. Lewis under the trust deed of that farm to Kenneth H. Lewis and himself, for the benefit of themselves and Annie F. Lewis, Jessie Lewis, Lenora L. Jackson, Dexter W. Lewis and Edison Lewis. And these trusts may be enforced by a sale of those interests, but subject to mortgages, if there be any.

It also appears that since the trust arrangement was entered into, J. M. Jackson and Kenneth H. Lewis have paid certain sums for interest and taxes on the farms. Equity requires that they should be reimbursed for so much of such payments as were for the benefit of such interests as are herein charged with the payment of the trust funds, with interest. In the record before us, however, it does not appear in every instance, for which of the two properties the payments were made, and out of which reimbursement should be made.

We have so far limited the right of recovery, as to the Sagamore farm, to the interest of W. E. Lewis. He is the only defendant in the bill touching that farm. None of the other cestuis que trustent have been made parties to that bill. Nor have J. M. Jackson and S. L. Symonds, who are interested in that farm, the same as they are in the Sherman farm. That trust had been created before the bill was filed, but the trust deed was not recorded until afterwards, and probably neither the deed nor its contents were known to the plaintiff when it brought its bill. When the fact was discovered, however, these persons should all have been made parties, as they were in the bill touching the Sherman farm. And the question arises whether they ought not to be made parties even now. This bill was heard below in connection with the other bills to which they were all parties, and the distinction of parties seems to have been lost sight of on all hands. Various admissions were made seemingly as if applicable to all parties. The cases were, in fact, tried as one case. Of course, we cannot render a judgment against persons who are not parties. Ordinarily at this stage of a case, we should not retain a bill for the summoning in of additional parties. But we think, in

view of the circumstances alluded to attending the trial, and because we think that justice to both the plaintiff and this defendant requires it, the same persons should be made parties in the Sagamore bill, as are so made in the Sherman bill. In this way it can be ascertained in one proceeding whether interests of the others in this farm are subject, with W. E. Lewis's interests, to be charged with the payment of this trust fund; and if so, in what proportion, and subject to what reimbursement, so far as J. M. Jackson, S. L. Symonds and Kenneth H. Lewis are concerned. The equities of all the parties can thus be adjusted, on one bill.

In the case of the Sherman farm, the appeal is sustained, and the bill is sustained, and with costs against the parties who have answered. The case will go to a master, (unless the parties agree,) to ascertain for how much J. M. Jackson and Kenneth H. Lewis should be reimbursed for payments made for taxes and interest, on account of this farm, that is, for such payments as were for the benefit of the interests of Annie F. Lewis, Jessie Lewis, W. E. Lewis, Lenora L. Jackson, Dexter W. Lewis and Edison Lewis, namely 45-64, with interest. Upon the coming in of the master's report, a decree will be made below for a sale of the above mentioned interests of Annie F., Jessie, W. E., Dexter W. and Edison Lewis and Lenora L. Jackson, in the Sherman farm, and for the payment out of the proceeds, after the expenses of the sale are paid, to J. M. Jackson and Kenneth H. Lewis of 45-64 of the amounts severally paid by them for interest and taxes, on account of this farm; then the payment to the plaintiff of $1,000, and interest, in lieu of an accounting for use and profits, from May 1, 1899; and then the payment of the balance to the several cestuis que trustent whose interests are sold, according to their respective shares under the trust deed.

In the case of the Sagamore farm the appeal is sustained, and the bill is sustained against W. E. Lewis, with costs. But the bill will be retained without further decree against him, until the other persons interested, who are named above, are made parties to the bill. And after it shall be ascertained whether their respective interests are also to be charged with the payment of the trust fund, the whole case will go to a master for the same purposes as in the Sherman

bill, and the same proceedings will be had and decree passed as are above directed in that bill. In this case the amount to which the plaintiff will be entitled is $3,000 and interest from March 28, 1901.

In the third case, the bill is to be dismissed with one bill of costs.

The cases having been heard together, the costs in each before being taxed must be apportioned by a justice sitting below.

*So ordered.*