PRIMEAU v. GRANFIELD.

(Circuit Court, S. D. New York. January 23, 1911.)

1. TRUSTS (§ 219*)—CONSTRUCTIVE TRUST—INTEREST.

Where defendant to whom complainant gave money to be invested converted the money to his own use, and the circumstances of the conversion indicated wantonness, the fact that defendant got no return from his investment and use of the money did not relieve him from liability for simple interest in an action for an accounting.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 314; Dec. Dig. § 219.*]

2. TRUSTS (§ 350*)—INVESTMENT OF TRUST FUNDS—REMEDIES OF BENEFICIARY—ELECTION.

When a trustee makes a separate investment of trust funds though wrongfully, the beneficiary may follow the money into the res, or may elect to pursue the money as a lien or charge thereon.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 515–519; Dec. Dig. § 350.*]

3. TRUSTS (§ 350*) — CONSTRUCTIVE TRUSTS — MIXING FUNDS — ELECTION OF REMEDY.

Where a trustee wrongfully mixes his own money with that of his cestui que trust and invests the same, the beneficiary does not thereby lose the right to follow his money into the res as property and claim an interest therein, nor is his claim limited to a charge on the property to the

---

extent of his investment, but he is entitled either to enforce his right to a proportionate interest in the property in which the money has been invested, and recover proportionate profits, or to enforce a charge or lien at his election.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 515–519; Dec. Dig. § 350.*]

4. TRUSTS (§ 354*)—TRUST FUNDS—MINGLING—INTEREST OF BENEFICIARY.

Where a trustee wrongfully invested certain of the trust funds in a mining lease, and thereafter sold a one-eighth interest in the lease for $3,000, the beneficiary's interest in that sum was not a sum proportionate to the respective contributions of money by the beneficiary and the trustee up to that time, which had entered into the mine, but was the proportion to which, in equity, the beneficiary was entitled in the whole mine; which was so much as he had contributed to the trustee's total payment, royalty, etc., which made up the consideration for the lease, and this though at the time of the sale, the beneficiary's proportion could not be ascertained, but must remain indefinite until all the expenditures were completed.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 527; Dec. Dig. § 354.*]

5. MORTGAGES (§ 199*)—INTEREST OF MORTGAGEE—PROFITS.

A mortgagee has no interest in the property except to have it sold for his debts, and it is of no consequence to him what profits are made from it or in what form they may be so long as the property remains adequate security.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 513; Dec. Dig. § 199.*]

6. TRUSTS (§ 354*)—FOLLOWING FUNDS.

A trustee used certain funds of his cestui que trust to pay a mortgage on the trustee's house, and thereafter put on another mortgage and used the proceeds for the development of a mine. *Held* that, though the beneficiary was subrogated pro tanto as between himself and the trustee to the equity of the first mortgage which his money was used to pay, and was also entitled to a lien on the proceeds derived from the second mortgage, as well as on the trustee's equity in the house, his rights were limited to those of a lienor, and hence he could never become a co-owner with the trustee of any property in which the money derived from the second mortgage had been invested.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 527; Dec. Dig. § 354.*]

7. TRUSTS (§ 354*)—TRUSTEES—WRONGFUL INVESTMENT OF TRUST FUND—RIGHTS OF BENEFICIARY.

A trustee obtained the lease of a mining claim for a term of years with the right to take therefrom all the ore that he chose, agreeing, in return, to work the mine continually with 50 shifts of men per month during the whole term of his possession, and to pay a rent in the form of royalty of 20 per cent. on all of the smelter returns of the ore which he should take out. In developing the mine and performing his agreements under the lease, he wrongfully used certain of his beneficiary's funds. *Held,* that the rent and royalty as used in such lease meant payment for the use of the ground in money, and that the beneficiary in an action against the trustee for an accounting would be entitled to that proportion of the value of the ore as it lay in the ground, as was represented by his contribution to the total expenses of working the mine plus the total rentals or royalties paid to the lessor, together with interest on such sums from the date of their receipt by the trustee.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 527, 528; Dec. Dig. § 354.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

184 F.—31

In Equity. Suit by Paul A. Primeau against Horace Granfield. Decree for complainant.

See, also, 180 Fed. 847.

Mark Hyman, for complainant.
Edmund F. Richardson, for respondent.

HAND, District Judge. The defendant does not raise upon his brief the exceptions to the rulings of the learned master upon the falsifications of his five credits, and I shall therefore not consider them. As to interest, I will not allow compound interest, but I see no reason why the defendant should not pay simple interest. The circumstances of his conversion of the money were especially wanton, and the fact that he did not get any return for it does not relieve him from wrongdoing, nor the complainant from .the loss arising from being kept out of it for so long. The complainant, whether or not his conduct has been altogether what one could wish, has certainly been much abused in his confidence, and his loss is not made good by the mere return of his principal at the end of 11 years.

The next question, therefore, is as to following the trust funds. The first question is whether from any point of view Primeau can get more than a charge upon the whole Raaler funds to the extent that his money went into it. If not, then it will be unnecessary to go further in the inquiry. No one disputes that when the trustee makes a separate investment of trust funds, though wrongfully, the beneficiary may follow the money into the res, or may elect to pursue the money as a lien or charge upon the res. The claim is that, when the trustee's money is mixed with that of the beneficiary, he loses the right to follow the res as property, and has the right only to hold it for a charge to the extent of the claim. On principle there can be no excuse for such a rule. There is no reason why, by adding his own funds to the beneficiary's, the trustee should change the beneficiary's rights in the investment, provided there is no doubt what was the proportion of ownership in the funds actually invested. As Lord Brougham says in Docker v. Somes, 2 Myl. & K. 664, that is just the case most likely to arise, when a guilty trustee has used the funds in his own business. Why the estate should suffer all the risk and give the trustee the profit if he wins is beyond comprehension.

Upon authority, also, there is no question that the beneficiary is not limited merely to a charge. Authorities which distinctly proceed upon that theory and cannot proceed on any other are the following: Docker v. Somes, 2 Myl. & K. 664; Wedderburn v. Wedderburn, 4 Myl. & C. 41; Bohle v. Hasselbroch, 64 N. J. Eq. 334, 51 Atl. 508, 61 L. R. A. 323 (Errors & Appeals, 1902); Watson v. Thompson, 12 R. I. 466; Bitzer v. Bobo, 39 Minn. 18, 38 N. W. 609; Bazemore v. Davis, 55 Ga. 504; Greene v. Haskell, 5 R. I. 447; McLeod v. Venable, 163 Mo. 536, 63 S. W. 847; City of Lincoln v. Morrison, 64 Neb. 822, 90 N. W. 905, 57 L. R. A. 885. I do not find a single case, and I have read a great many, in which the plaintiff's claim for a proportionate profit was disallowed when there were profits to get, and he claimed profits instead of his money with inter-

est. In Atkinson v. Ward, 47 Ark. 533, 2 S. W. 77, a charge only was declared, and the property was sold, although the bill had prayed for a conveyance; but, so far as appears from the report, there were no profits, and the plaintiff was content enough to have the property sold and to get back his money out of it. In any case the point was not raised. The same is true of Land Co. v. Lewis, 101 Me. 78, 63 Atl. 523. There are almost numberless cases in which the words are repeated of Sir George Jessel's judgment in Knatchbull v. Hallett, L. R. 13 Ch. D. 696, 710, that where the trustee's money has been mingled with the beneficiary's the beneficiary is entitled to a charge or lien, but in none of these cases did the plaintiff claim more than to get his money back, and the question of profits was not raised in a single one. The same is true of Knatchbull v. Hallett, supra, itself. Docker v. Somes has never been questioned and was followed by Lord Cottenham in Wedderburn v. Wedderburn, supra.

Another class of cases is that of resulting trusts. I need hardly say that these have nothing whatever to do with the present question because they only decide what is the supposed intention when one person voluntarily pays his own money as part consideration for a conveyance to another. It has long been established law that unless the advance is in some aliquot part of the consideration, it will be assumed to be only a charge. The reason is quite obvious, which is that people do not usually own real property in any but aliquot shares, and that the presumption of intent must follow the usual practice of people.

The case of Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132, remains, in which the plaintiff held municipal bonds illegally issued. The bonds having been declared invalid, the plaintiff then sought to have a lien impressed upon the public improvements built with his money. The Supreme Court dismissed the bill for various reasons. The grounds of the decision are not perfectly apparent, except that it is quite clear that the court had no such idea in mind as would help the defendant in this case. A sufficient ground stated was that the bondholders were participes criminis in the violation of the charter, and an equity court would no more raise a trust in their favor than it would raise an implied assumpsit. Another ground seems to have been the difficulty of ascertaining the interests of all persons who would have liens if any such existed. However, whatever the meaning of the language of Mr. Justice Miller, it seems to go to the extent, when so construed, as to forbid any tracing whatever of mixed funds, even for the purpose of establishing a lien, which was certainly not intended to be laid down as the law, for it would have overruled National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693. It is either good to that extent or it is to be explained as dependent solely upon the facts of that case, which is as Judge Lowell explains it in Re Mulligan (D. C.) 116 Fed. 715, 717. It is only fair to say, however, that in Randolph v. Allen, 73 Fed. 23, 39, 19 C. C. A. 353, the present Chief Justice, sitting in the Circuit Court of Appeals for the Sixth Circuit, cited Litchfield v. Ballou, supra, for the proposition that the beneficiary could not even assert

a lien upon mingled funds. That remark was obiter and I cannot think that the decision in National Bank v. Insurance Company, supra, has been overruled. Unless it has, these obiter remarks do not help the defendant, because they do not support his distinction, and even contradict the law, as he concedes it. They revert to the old rule that mingling of trust moneys with the trustee's stops all further identification. Therefore, I conclude that the beneficiary may follow his mingled funds and become at his election a co-owner with the trustee.

A more difficult question, because it is without authority, arises in ascertaining what part of the withdrawals shall be deemed to have been Primeau's money. I shall consider. each bank account as if it were a separate fund, because the parties consent to that disposition. No one disputes that, if the interlocutory decree be right, then some of Primeau's money went into the several bank accounts. Primeau by that mingling got more than a lien, and got the option either to claim a lien or to claim that he was a co-owner in the fund. The language about presumed intent in Knatchbull v. Hallett, supra, which Sir George Jessel laid down with his customary vigor, was merely a way of giving an explanation by a fiction of the right of the beneficiary to elect to regard his right as a lien. That it is a fiction appears clearly enough in this case where Granfield could have had no intention about the investments as he meant to use all the money for himself anyway. To say that in such a case he will be "presumed" to intend to take his own money out first is merely a disingenuous way common enough, to avoid laying down a rule upon the matter. This fiction in Re Oatway (1903) 2 Ch. Div. 356, would have brought the usual injustice which fictions do bring, when pressed logically to their conclusion. Logically, the trustee's widow, in that case, was quite right in claiming the first withdrawal, although the trustee had invested it profitably, and had subsequently wasted all of the fund which had remained in the bank. That was, of course, too much for the sense of justice of the court which awarded to the wronged beneficiary the investment, intimating that the rule in Knatchbull v. Hallett, supra, applied only where the withdrawals were actually spent and disappeared. If to that rule be added the qualification that if the first withdrawals be invested in losing ventures, then the beneficiary is to have a lien, if he likes, till he uses up that whole investment, and then may elect to fall back for the balance upon the original mixed account from which the withdrawal was made, there is no objection, but it is a very clumsy way of saying that he may elect to accept the investment if he likes, or to reject it. The last is the only rule which will preserve to the beneficiary the option which he has when the investment is made wholly with his money. Suppose, as here, that the trustee deposits the money with his own in a bank. That is an investment. We call it a deposit, but we all know that it is only a chose in action. The beneficiary has the right at his election either to become a part owner in this chose in action, or to keep a lien upon it. Suppose he chooses to be a part owner; then, when part of it is released by payment, he is likewise a proportionate co-owner in the money paid. If that money is in turn invested he is a propor-

tionate co-owner in that new investment, and there is no ground why as to that investment likewise he should not have, at his election, the right to become a lienor pro tanto. Sir George Jessel's dictum in his judgment in Knatchbull v. Hallett at page 710 did not deny this, if the words are nicely observed. He says that in the case of a purchase with a mixed fund "the cestui que trust, or beneficial owner, can no longer elect to take the property, because it is no longer bought with the trust money purely and simply." No one can dissent from that statement of the law. Then he at once follows it by saying that he does have a charge, which, likewise, no one disputes; but he nowhere says that he has only a charge, and may not have pro tanto an ownership. Two chancellors, Lord Brougham and Lord Cottenham, had previously said that the beneficiary might have such an ownership, and later in Re Oatway it became apparent that, if not, then very great wrong could be done. Sir George Jessel was a very great equity judge, and no one should lightly differ with him, but there is no reason in this case to impute to him anything of the kind here suggested, or to press the fiction of a presumed intent to a conclusion which is out of harmony with the rights of a beneficiary in the analogous case where there has been no mingling of the funds.

The next question is what are the funds to be traced into Granfield's bank accounts. Upon this I must rely upon the oral argument, for the defendant's brief does not discuss the question, and I have no means of knowing how much he disputes. There are three funds claimed to have gone in: The "French Fund," the "Duke Fund," the "Mortgage Fund." There is no dispute that the "French Fund" went into the banks, and I have already decided that they were trust moneys. The "Duke Fund" arose from the sale by Granfield to Mrs. Duke of a one-eighth interest in the lease. He got for this the sum of $3,000, which he deposited in the banks and used. This the master has divided in proportion to the respective contributions of money up to that time entering into the mine. That division I cannot accept. What Granfield sold was an interest in the mine, and Primeau's share of the proceeds of that sale was that proportion to which in equity he was entitled in the whole mine. That proportion, as I shall hereafter show, was so much as he contributed to Granfield's total payments, as royalty and otherwise, all of which together made up the consideration for the lease. It makes not the slightest difference that at the time of the sale to Mrs. Duke Primeau's proportion could not be ascertained, and that it must remain indefinite until all the expenditures were completed. It is often the case that a man may have rights the extent of which cannot at once be ascertained. The easiest way to treat this payment in the account is to disregard it altogether, both in estimating what Primeau put into the mine, and the total payments which formed the whole consideration. This is also the correct way, because by just that proportion in which it would swell the total consideration, by just the same proportion would it swell Primeau's share of the consideration. To illustrate: Suppose that the total consideration, excluding this sum, paid by Granfield was $100,000, and the sums paid by Primeau $2,000, then Primeau had an interest of 2 per cent. in the mine.

That interest he also had in the share sold to Mrs. Duke, and in the $3,000 for which it is sold. The actual total expenses were, however, $103,000, of which therefore Primeau contributed $2,060. As we are concerned only with percentages, the sum of $3,000 may be left out altogether.

The last fund is the "Mortgage Fund." Out of Primeau's funds $4,140 had gone to pay a mortgage on Granfield's house; therefore, in equity Primeau was subrogated, pro tanto as between himself and Granfield, to the equity of that mortgage. When in extremis Granfield put another mortgage of $3,000 on his house and used the money in the mine. Primeau now claims that all of this fund of $3,000 must in equity be regarded as his money because the new mortgage became a first mortgage succeeding his own. That, however, is not in my judgment correct. A lienor has no interest in the property except to have it sold for his debt, and it is of no consequence to him what are the profits made from it or in what form it may be, so long as it remains adequate security. Primeau's rights were wholly as a lienor, in subrogation to the original mortgage, which his money had paid. He never became a part owner in the house, or in the money which came from the house. I agree that he was entitled to a lien upon the $3,000 which Granfield got on the subsequent mortgage as well as on the equity in the house, but his rights were limited to those of a lienor. Whatever Granfield did with that money, Primeau could never become a co-owner in it, because his money had never gone into it, but into a mortgage which was an incumbrance upon it. It is, therefore, of no consequence how the lien is marshaled between the fund and the house. Therefore, the only funds which Primeau has traced into the Raaler lease are the "French Funds," but as to those he is entitled to select any investments upon the assumption that he was the owner of that proportion of the money invested which his money bore to the total fund at the time of the withdrawal.

Having now traced a certain portion of Primeau's money into the expenditures made to sink the shaft and open the Raaler lease, the question is whether Granfield's return from the mine was in law the proceeds of that money. That question involves what is meant by "tracing" money into another form. Literally Primeau's money was used in buying machinery and paying the wages of men, to work the mine. The result of that work was to sink a shaft, discover and uncover certain bodies of ore and to bring them to the surface. As to one element—i. e., that of making the ore bodies accessible and bringing them to the surface—that added no more to their value than the actual work done. That is to say, assuming the existence of known ore bodies, their value in the soil is substantially only so much less than when brought out, as the cost of sinking the shaft and opening the drifts. There is no miraculous addition to them by the mere fact of cutting away the superincumbent rock so as to reach them.

As to the second element—i. e., the discovery of the ore—the matter is not so easy. On the one hand it is quite obvious that the ore was not created by its discovery; it was always there. Moreover, its presence was thought not unlikely, or else no one would have spent money looking for it at that place. The money was spent to see whether the

conjecture would be verified. Still it is undoubtedly also true that the verification of this conjecture added value to the lease itself. To give value to such property, not only must it in fact have gold, and be suspected as having it, but it must be known to have it, because value exists in the known uses of a thing, not in the unknown. It cannot therefore be denied that the one cause of the increase in the value of the lease was because Primeau's money went to discover it. However, it is not enough that the expenditure was one cause of the discovery to make the consequent value of the lease the product of that money. There might be a number of such causes running back in time and though the value of the lease was the product of all of them jointly it cannot be said to be the product of any one. How much is to be attributed to the ore itself, for example, and what proportion shall be assigned between the money spent to discover the ore and the ore? Certainly it would be absurd to say that the ore which gave all the value when discovered should not count at all. Therefore, so far as I know the law has never gone into such metaphysics to ascertain how much such expenses contributed to the ore; certainly not, when as here, there is a very much more simple way of ascertaining what the product of the money was. If Granfield had owned the land in fee, and had used the money to explore, these questions might have arisen, but he did not. He had purchased these rights, and they were therefore produced, as rights anyway, by the money which he paid for them under the lease itself. If Primeau's money was part of what he paid, then pro tanto it produced the rights which became so valuable. What then did Granfield have to pay for these rights?

Under the lease Granfield got a term for years in a certain piece of realty with the right to take from it all the ore that he chose. The consideration—i. e., what he gave in exchange for that right—consisted of certain promises upon his part and in the performance of those promises he used some of Primeau's money. The total performance was what he gave in exchange for what he got. Now his performance included working the mine continuously with 50 shifts of men per month during the whole time of his possession, together with the payment of a "rent" in the form of a "royalty" of 20 per cent. upon all the smelter returns of the ore which he should take out. It is quite true that the parties undoubtedly expected that if Granfield struck ore he would in fact pay the rental out of his winnings, and also keep the mine operating by the same means. However, what the parties expected would be the actual course of the business, is quite different from what they stipulated should be their mutual rights and obligations. Whatever Granfield might in fact do, he was not bound to divide the ore with the lessor, and he was bound to pay the rent. Indeed, if he had been the operator of many mines, he would probably have never divided the ore with the lessor in practice. When once the smelter returns had fixed his obligation, the whole ore remained his for better or worse. I do not forget the provision of the lease that the ore shall remain the lessor's, but that can only mean to give him a lien upon it for security of his rent, else otherwise it would defeat the whole purpose of the lease. Nor was this difference in rights fanciful

in result. There have been times when gold was the most speculative of commodities and in 1899 the time was not far past when it had again appeared quite likely to become such. Moreover, it does not appear how the gold was to be sold and in the absence of proof I cannot assume that there were not risks of loss in its transportation and sale as in the case of any other commodity. Whatever the risk of loss or chance of profit upon the whole ore it was Granfield's. Or to take the question of the continued operation of the mine; it was, of course, not dependent upon the mine's continuing to pay after it had once started, but was an absolute covenant during the life of the lease. No doubt, in fact, there was no need of such an obligation, once the mine became paying, but here, as before, the question is not of expectations, but of what the parties meant to be bound by.

If instead of being a gold mine, this had been an iron or a diamond mine, no one would have thought for a moment of regarding it as a co-ownership, instead of what the parties called it, a matter of "rent" and "royalty." Then Granfield would have had to "finance" his rent by arranging to pay money before he sold his product. Gold is, however, so nearly the equivalent of money that one easily confuses the two. Yet they are not identical, and the lessor could under this lease have refused anything in payment but money. Had Granfield, for instance, offered to divide the ore, or the bullion from the ore, the lessor would have had as much right to refuse as if it had been iron, or copper, or coal, or zinc. "Rent" and "royalty" mean the payment of money, and Granfield did not get money out of the mine, but the raw material from which money is made. In my judgment, therefore, the lease was procured by the payments not only to open up the mine originally, but by all the royalties paid and by all the subsequent work of operation. On the other hand, the value of the rights acquired was not Granfield's net winnings, but the total gross value of all the ore, as it lay in the ground and before it was taken out. What Granfield got was the right to take it out, and that is the right into which Primeau has traced his money. Whatever it cost to take it out he must be allowed, for even a defaulting trustee is allowed for beneficial expenditures. Nor does it make any difference that those expenditures were likewise a part of the consideration for the right itself.

This opinion will require a new calculation, but not, I hope, a new reference. Primeau will be entitled to that proportion of the value of the ore in situ, as is represented by his contribution to the total expenses of working, plus the total rentals or royalties paid the lessor. Interest upon these sums from the date of their receipt by Granfield will also be allowed.

Let a final decree pass in accordance with this opinion.