## MID-PACIFIC DRESS MANUFACTURING COMPANY, LIMITED, ET· AL., *v.* L. V. CADINHA, AS ASSIGNEE FOR THE BENEFIT OF THE CREDITORS OF THE NEW YORK DRESS COMPANY, LIMITED, ET AL.

. No. 2122.

ARGUED FEBRUARY 27, 1935.          .          DECIDED JULY 25, 1935.

COKE, C. J., BANKS AND PARSONS, JJ.

This case is before us upon writ of error to review a decree of a judge of the first circuit court in equity setting aside a sale and granting other relief to the petitioners. In their bill of complaint petitioners allege in effect and among other things that under date of December 14, 1929, the New York Dress Company, Limited, an Hawaiian corporation, made an assignment of all of its property for the benefit of its creditors to the defendant L. V. Cadinha, for the uses and purposes and with the powers in said assignee specifically set forth in the instrument of assignment, a copy of which is attached as Exhibit A to said bill of complaint; that the said powers included among others the power "to take possession of said property and assets and to sell and dispose of the same with all reasonable diligence either at public or private sale and for the best prices that can be obtained therefor and to convert the same into money; to collect all such debts and demands thereby assigned as may be collectible; and with and out of the proceeds of such sales and collections and in the order following: 1. To pay and discharge all debts, claims and demands against said New York Dress Company, Limited, having preference under the laws of the United States and the laws of the Territory of Hawaii; 2. To pay to T. Kunikiyo, lessor of the premises upon which the store of said New York Dress Company, Limited, is located, back and future rents as in the lease provided; 3. To pay and discharge all the just and reasonable expenses, costs and charges for services leading up to and performed in the preparation and execution of said indenture and of carrying into effect the trust thereby created, including the expenses of continuing the business of said New York Dress Company, Limited, as in said indenture provided and the lawful commissions of said L. V. Cadinha for his services in executing said trust; 4. To pay and discharge in full so far as the residue of said proceeds are sufficient for that

purpose, the claims of all creditors of said New York Dress Company, Limited, ratably and in proportion by such installments and at such times as said L. V. Cadinha shall have money available for that purpose; 5. To pay any balance remaining after all claims have been paid in full, to said New York Dress Company, Limited, its successors and assigns, to be held and disposed of by it as if said indenture had not been made and executed."

In the assignment attached to the bill of complaint it is further provided that said L. V. Cadinha as said assignee might continue the business of said New York Dress Company, Limited, for such period as in his judgment might be advantageous to the performance of the trust thereby created. General power of attorney with right of substitution, employment and compensation of others in the premises is conferred upon Cadinha in the same instrument, which provides that "it is further covenanted and agreed that Robert McCorriston, George G. Cantlay, J. F. Carreiro and L. V. Cadinha, hereby appointed an executive committee, shall, by majority vote, have general authority and control over any operations of the assignee herein provided. The said executive committee may, in its sound discretion and judgment, by a majority vote, close and discontinue the business and wind the same up prior to the 15th day of February, 1930, herein mentioned, or extend the same to such time as the said committee may determine."

The bill further avers that "pursuant to the provision of said indenture, said L. V. Cadinha, as said assignee, on or about the 14th day of December, 1929, took possession of all of the property and assets of New York Dress Company, Limited, in said indenture to him assigned, * * * and elected to continue the business of said New York Dress Company, Limited, and did continue said business until about the 17th of February, 1932; that said L. V.

Cadinha, as said assignee, paid to the creditors of said New York Dress Company, Limited, on the 28th day of December, 1931, sums amounting to ten per cent (10%) of their claims against said New York Dress Company, Limited, and on the 18th day of February, 1932, said L. V. Cadinha, as said assignee, paid to said creditors further sums amounting to about five per cent (5%) of their said claims as final dividends thereon." The bill further avers upon information and belief that "on or about the first day of April, 1930, said L. V. Cadinha as said assignee, hired and employed C. T. Davenport to manage the business of said New York Dress Company, Limited; * * * that said L. V. Cadinha and said C. T. Davenport at or about the time of said employment fraudulently conspired and colluded together to the end that they might conduct said business for their own benefit and eventually acquire the same as their own property; that in pursuance of said conspiracy so entered into between them said C. T. Davenport and said L. V. Cadinha conducted the business in a manner so as to enhance the value of its assets without payment of dividends or returns to creditors excepting as hereinabove set forth * * *; that the inventory taken by said L. V. Cadinha as said assignee, at or about the time he became said assignee, displayed a value far less than the true value of the goods, wares, merchandise and assets of said business at the time he became said assignee; that furniture and fixtures and improvements made on the premises occupied by said business costing in the neighborhood of $5,000.00 and of approximately that value to a going concern were inventoried by said L. V. Cadinha, * * * at $500.00; that said L. V. Cadinha looking to the acquisition of said business by himself and * * * C. T. Davenport under said conspiracy installed mechanical devices and furniture and fixtures and made repairs, alterations and additions to the store at the expense of the creditors of

\* \* \* New York Dress Company, Limited, and in order that the business to be so acquired by them might be enhanced in value to the detriment of \* \* \* creditors."

The bill further averred, in part and in effect, that in pursuance of said fraud and conspiracy L. V. Cadinha and C. T. Davenport, at the expense of Cadinha as assignee, but for the sole purpose of acquiring the property, hereinafter named, by himself and Davenport, caused to be opened and operated a number of other stores; that Davenport made a trip to the mainland for the purpose of establishing credit for the business to be acquired by himself and Cadinha, the expenses of which trip were charged to Cadinha as assignee; that Cadinha and Davenport purchased claims from the creditors of said New York Dress Company, Limited, for whom Cadinha was trustee, at sums grossly below their value and caused said claims to be presented to Cadinha as assignee, and for said claims there was paid a sum in excess of the amount for which Cadinha purchased them, constituting a secret profit which should inure to the benefit of the creditors; that on or about the 17th day of February, 1932, Cadinha sold, assigned and transferred to Davenport for a grossly inadequate price all of the property and assets of the New York Dress Company, Limited, remaining in Cadinha's hands as assignee by an instrument, a copy of which is attached to said bill as Exhibit B thereof; that thereafter, for the purpose of perpetuating the fraud above referred to, Cadinha and Davenport organized under the laws of the Territory a corporation known as C & D Dress Company, Limited; that upon the organization of said corporation Davenport sold, assigned and delivered to said C & D Dress Company, Limited, all of the property and assets thus acquired by him from Cadinha; that Cadinha is president, and Davenport is vice-president and treasurer of said C & D Dress Company, Limited; that Cadinha and Davenport are the

holders of practically all of the shares of stock of said C & D Dress Company, Limited, and that that portion of the name of said corporation, "C & D," is meant to represent and does represent the initials of Cadinha and Davenport; that Cadinha's overcharges on account of commissions as said assignee amount to more than $6000.

Petitioners further aver that the Mid-Pacific Dress Manufacturing Company, Limited, is the assignee for a valuable consideration and the present owner and holder of the claim originally held and owned by W. H. Seligson against the New York Dress Company, Limited, which amounted to the sum of $3,509.73 prior to the payment of dividends above mentioned; that the Mid-Pacific Dress Manufacturing Company, Limited, is the owner of 970 shares of the capital stock of the New York Dress Company, Limited, of a par value of twenty dollars per share and an aggregate value of $19,400; that the petitioner Theo. H. Davies & Company, Limited, is the owner and holder of a claim against said New York Dress Company, Limited, which amounted to the sum of $4,156.80 prior to the payment of said dividends; that the above-named claims of the Mid-Pacific Dress Manufacturing Company, Limited, and Theo. H. Davies & Company, Limited, were duly filed and allowed; that the petitioner V. D. Doty is the owner and holder of a claim against the New York Dress Company, Limited, in the sum of $2,050 by reason of the payment he made on the 15th day of April, 1932, of a certain promissory note dated April 23, 1928, made by the New York Dress Company, Limited, to the Bank of Hawaii, Limited, upon which he was an endorser with W. H. Seligson; that the total amount of the claims against the New York Dress Company, Limited, held and owned by the petitioners is in excess of thirty per cent of the total indebtedness of the New York Dress Company, Limited; that the petitioners bring said bill for accounting and to set

aside sale on behalf of themselves and all other creditors of the New York Dress Company, Limited, who may choose to come in and take the benefit of any decree which may be made in this cause.

Upon the foregoing and other allegations the petitioners ask for an accounting. They further ask that upon said accounting Cadinha be surcharged with all commissions in the premises; that the court make and enter a decree declaring the sale and transfer of the property and assets of New York Dress Company, Limited, by Cadinha to Davenport and by Davenport.to C & D Dress Company, Limited, null and void, and for other and further relief.

A demurrer, based upon sixteen grounds, not necessary to be set forth, was interposed to the bill of complaint above outlined but upon default of appearance by respondents to argue or submit the same the demurrer was overruled.

Answering to the merits respondents admit the assignment and the validity of the former claims of W. H. Seligson for $3,509.73 and Theo. H. Davies & Company for $4,156.80, and allowance of the same, but aver that said claims have been fully satisfied by dividends of ten and five per cent to said creditors upon distribution of all the assets of said New York Dress Company, Limited. Respondents deny that the petitioner V. D. Doty "now has or ever had a claim in the amount of $2,050.00 or in any other amount, against the New York Dress Company, Limited, or against L. V. Cadinha as assignee of the creditors of said corporation, and in this connection respondents allege that the payment of $2,050.00 referred to in * * * petitioners' bill of complaint was merely a payment made by the said V. D. Doty to the Bank of Hawaii, Limited, as endorser on a promissory note, the obligation evidenced by which had already been discharged and released as against the New York Dress Company, Limited, and the assignee

for creditors of said corporation by the payment of a final dividend in full settlement of the claim of said Bank of Hawaii based thereon, and that the payment of said sum to the Bank of Hawaii was merely in satisfaction of a personal obligation of said V. D. Doty as such endorser, arising after full distribution of all of the assets of said New York Dress Company, Limited, remaining in the hands of said assignee, and after release of said New York Dress Company and of said assignee of all further liability thereon, and respondents further allege that said V. D. Doty at no time presented any such claim against the New York Dress Company, Limited, or against said assignee * * * at any time prior to such final distribution and final settlement of all claims of creditors. * * * Respondents deny that said petitioners or any of them own or hold any present lawful claims against said New York Dress Company, Limited, or against any assignee of the assets thereof."

In effect and in part and upon information and belief the answer further avers that the petitioners are acting for themselves alone in bringing the bill for an accounting and to set aside the sale; that all other former creditors of the New York Dress Company, Limited, have refused to become parties to said proceedings and that they are and have at all times been fully satisfied with the doings of the assignee aforesaid. The answer avers that upon final liquidation of the assets of said corporation and in final settlement of the claims of creditors in the premises the assignee distributed all remaining assets as final dividends to the creditors, amounting to a sum in excess of five per cent of the total claims of said creditors and that Cadinha, having completely performed all duties to be performed by him as assignee in the premises and having distributed all properties and assets of said corporation remaining in his hands as said assignee, became and was absolved from all further responsibility in the premises. The respondents

admit that at the time alleged Cadinha employed Davenport to act as manager of the business of the New York Dress Company, Limited, but deny all allegations of fraud, conspiracy and collusion.

The respondents further deny that Cadinha purchased claims of creditors as alleged or at all and deny that Davenport ever purchased claims at sums grossly below the value thereof, and further deny that Davenport was ever paid any sum or sums in excess of the amounts for which he had purchased claims or that he made any secret profit or any profit at all in this regard, and in this connection respondents allege that Davenport, acting individually and for himself alone, did purchase certain claims at prices which later developed to have been in excess of the true value thereof and that he received on payments of said claims sums less than the amounts he had paid therefor to his personal loss in the sum of $440.90.

The conveyances from Cadinha to Davenport and from Davenport to the C & D Dress Company are admitted. Respondents allege that the conveyance to Davenport was made for full and adequate consideration and only after said proposed sale and the terms thereof and the amount to be realized therefrom had been fully discussed with the members of the executive committee of the creditors of New York Dress Company, Limited, and had been fully approved by them, and only after Cadinha had become satisfied that no higher price could be obtained therefor from any other source, and only after said assets had been offered by Cadinha to Theo. H. Davies & Company, Limited, now a petitioner herein, at the same price and upon the same conditions. Respondents further deny that the C & D Dress Company, Limited, was organized in any sense in furtherance of or in perpetuation of any fraud upon petitioners or upon any other persons, and allege that respondent C & D Dress Company, Limited, is a corpo-

ration organized as such and incorporated under the laws of the Territory of Hawaii on March 5, 1932, at a time subsequent to the transfer and sale to said Davenport aforesaid and long after Cadinha had ceased to act as assignee. Respondents admit that Cadinha and Davenport are, respectively, president, and vice-president and treasurer of the C & D Dress Company, Limited; that they are stockholders of said corporation and that the initials "C & D" in the name of said corporation represent the names of said respondents respectively. Respondents allege that upon the organization of the C & D Dress Company, Limited, stock was issued to Cadinha and Davenport for good, sufficient and valuable consideration, only a part of which consideration was represented by the property transferred to the corporation by Davenport and by him received from Cadinha as above set forth; that in addition thereto other valuable consideration moved from Davenport and Cadinha to the corporation last above named in consideration of the issuance of stock to them, and respondents allege the net worth and value of the business and property formerly held by the assignee for creditors and acquired by Davenport as aforesaid was in the amount approximately of only $2,254.75, whereas the value of the assets of the C & D Dress Company, Limited, immediately after the transfer, to wit, of the property above named and its issuance of stock, was in the amount of approximately $26,000 and upward. Respondents further allege that the formation of the corporation C & D Dress Company, Limited, and purchase by said corporation of the property then remaining in the hands of Davenport, which had formerly been the property of the New York Dress Company, Limited, were in no sense a part of any conspiracy or fraudulent undertaking, but were the result of negotiations wholly separate and distinct from the transactions of the New York Dress Company, Limited, and as a result solely of negotiations

taking place after the final completion by Cadinha of performance of all obligations theretofore resting upon him as assignee for the creditors of the New York Dress Company, Limited, and after Cadinha had ceased to act in the capacity of said assignee and after all claims of creditors had been fully paid and satisfied by a final distribution of said property and the payment of the claims of said creditors. Respondents deny the allegation of excessive commissions.

Respondents further allege that all of the creditors of the New York Dress Company, Limited, or those creditors under whose claims they are now purporting to sue, joined in and consented to the terms and provisions of the assignment by consent in writing, attached to and made a part hereof, a copy of which consent is attached as Exhibit B to the answer, or were fully aware of said assignment and acquiesced in all respects therein or were actually parties to or participated in the making of said assignment at a meeting of creditors of said corporation and all received and accepted in full satisfaction of their respective claims the dividends above referred to. Attached to the answer as Exhibit B is a list of twenty-three creditors, alleged to have joined in said assignment and consented thereto, with the amounts of their claims set opposite their respective names. The list includes among others the names of Theo. H. Davies & Company, Limited, and the Bank of Hawaii, Limited.

Upon issue joined by bill and answer above outlined and by plaintiff's replication to the answer the case was heard upon its merits and a written decision was thereafter filed by the circuit judge. After a brief recital of the pleadings and a statement of the issues the latter said: "After a careful consideration of the oral testimony of the thirty odd witnesses sworn and the exhibits numbering well over one hundred, my conclusion is that respondents

Cadinha and Davenport did plan at and before February 17, 1932, to sell the business to themselves and that the events which transpired between that date and March 5th, the date of the incorporation of the respondent C & D Dress Company, Limited, were intended to and actually did carry their plan into execution. There is a great deal of circumstantial evidence in support of the above conclusion. Cadinha and Davenport carried on the business together for about two years. They busied themselves in purchasing claims of creditors. They paid little or no attention to offers and prospects of offers to buy the business. Cadinha attempted to purchase or acquire a portion of the capital stock of New York Dress Company, Limited. The sale of the business on February 17th to Davenport was made without any bona fide attempt to obtain bidders by advertising, auction, listing, or otherwise. All that was done in this regard was to offer the business to Theo. H. Davies & Company, Limited, and the Bank of Hawaii, Limited, both of which firms were not interested in the purchase of a retail business. The reason given for the necessity of the sale, that is, that there was a lack of working capital and creditors were pressing seems to be of little or no force in face of the payment of a 10% dividend on December 28, 1931, less than two months before the sale of February 17, 1932. To all intents and purposes Cadinha remained in the business from February 17, 1932, to March 5, 1932. The cash used to effect the sale was obtained by a note endorsed by Cadinha. Davenport transferred to C & D Dress Company, Limited, after its formation on March 5, 1932, all of the assets he had received from Cadinha without retaining any profits, etc., for himself for the period from February 17, 1932, to March 5, 1932, during which time he was supposed to be sole owner of the business. Both Davenport and Cadinha made statements indicating their intention to acquire the

business for themselves. Respondents' defense is based largely on Cadinha's evidence and credibility which was much shaken during the trial. These are some of the facts and circumstances showing that there must have been a plan, scheme, understanding or agreement between Cadinha and Davenport to acquire the business and assets of New York Dress Company, Limited, for themselves. Petitioners, as creditors of New York Dress Company, Limited, may have the sale by the assignee to himself or to Davenport for Davenport and himself set aside. Such sale must be set aside where as here the assignee is interested therein even without the existence of any plan or agreement between the assignee and Davenport to acquire the business and assets of the New York Dress Company, Limited." Then follow supporting citations. The decision continues: "From the above discussions of law and fact about which there can be little or no doubt or question it follows that both the sales or assignments here in question from Cadinha, assignee, to Davenport and from Davenport to C & D Dress Company, Limited, are voidable and must be set aside at the instance of petitioners who are creditors of New York Dress Company, Limited."

From the foregoing the judge concluded that the petitioners are entitled to the full amount of their claims remaining unpaid, not only to the property and assets of New York Dress Company, Limited, which passed into the hands and control of Davenport, Cadinha and C & D Dress Company, Limited, but to all of the fruits thereof of every form, its increase, its income, other property acquired by the exchange or use of it in any way and that only such of it as has passed into the hands of bona fide purchasers for value without notice of the misappropriation is exempt from the claims and rights of petitioners. The judge further held that the petitioners are entitled to an accounting from the constructive or resulting

trustees above named and to the payment of their claims either in whole or in part, if any assets are available for that purpose. Citations are given in support of the conclusion. Then follows a finding that the assignee's commissions were reasonable and a refusal to surcharge his accounts in their full amount. Commissions, however, upon the sale to Davenport on February 17, 1932, are disallowed and surcharged.

An interlocutory decree, dated May 1, 1933, was then filed setting aside the transfer from Cadinha to Davenport and the transfer from Davenport to the C & D Dress Company, Limited. The decree was in other respects in conformity with the decision above recited, and pursuant thereto an order was entered appointing a master to examine the records and assets of the respondents and make full report to the court pursuant to said interlocutory decree. This order was followed by an order of reference to the same general effect. Then followed, as the record discloses, a master's report of forty-three pages, exceptions (eighteen in number) thereto, and a decree dated August 9, 1933. The latter is termed a "Final Decree" and recites that according to the report of the master (averred not to have been objected or excepted to within the time theretofore allowed by order of the court) the net value of the trust estate on May 13, 1933, was $23,684.51. It decreed among other things that the respondents pay to the petitioners $10,729.82, with attorneys' fees and costs. This decree appeared to have been granted *ex parte* and it was later vacated, upon motion, and a final decree was filed under date of August 21, 1933, in part as follows: "It appearing to the court that the report of Matthew M. Graham, Esq., master, pursuant to the decision and interlocutory decree heretofore entered herein, has been filed, the respondents' exceptions thereto having been overruled by this court, and it further appearing to the court that the afore-

470

said report of Matthew M. Graham, master, reveals that the value of the trust estate of May 13, 1933, was eight thousand three hundred seventy-seven and 30/100 dollars ($8377.30) ; and whereas, on the 12th day of September, 1932, a bond was filed in the above entitled action by the respondents with the United States Fidelity and Guaranty Company as surety, conditioned upon the whole and complete satisfaction of this decree by the respondents above named or any of them; it is ordered, adjudged and decreed that the interlocutory decree and the report of Matthew M. Graham, master, heretofore filed herein, be incorporated in this final decree by reference and made a part hereof as if fully set forth herein." The respondents were further decreed to pay to the Mid-Pacific Dress Manufacturing Company, Limited, Theo. H. Davies & Company, Limited, and V. D. Doty, petitioners, the sum of $8,377.30, together with interest at eight per cent per annum from April 22, 1933, petitioners' attorneys' fees in the sum of $2000 and costs taxed at $1368.55. The decree concluded with an order that the United States Fidelity and Guaranty Company pay the above-named petitioners the sum of $10,000 on account of said monetary decree and that upon said payment its bond be canceled.

It is to correct alleged prejudicial error in the proceedings and decrees above outlined that the respondents have brought the case to this court upon a writ of error. The assignments of error, ninety in number, have had our attention within specified limitations, upon motion to dismiss decided February 3, 1934, as reported in 32 Haw. pp. 995-1009 inclusive. One ground (No. 5) of the motion to dismiss was the generality of each of the assignments. We then held the motion could not be sustained upon ground number five if any one assignment should be found to be sufficient, and five assignments, namely, numbers 63, 67, 68, 73 and 90, were found to be sufficiently specific to entitle them to consideration upon their merits.

In considering ground five there was no necessity of passing upon the sufficiency or insufficiency of the remaining assignments and opinion in that respect was expressly withheld.

Counsel for respondents again attack the remaining eighty-five assignments in their brief upon the merits as "too general and indefinite to warrant consideration by this court." A detailed examination of the assignments in this respect is not attempted in the briefs and will not be attempted here. Many of the assignments are obviously defective and are extreme examples of the type which this court has refused to consider in numerous and consistent opinions over a long period of time. Of the eighty-five assignments twelve, which do not exhaust the list, will serve for illustration. Assignments numbers 1, 2, 3, 5, 6, 7, 9, 21, 26, 43, 75 and 80 are as follows:

1. "The court erred in making and entering said decree and each and every part thereof." 2. "The court erred in not dismissing the petition herein." 3. "The court erred in making the decree and each and every part thereof, inasmuch as the provisions of the decree and each and every part thereof are beyond the scope of the issues as fixed by the pleadings in the cause." 5. "The court erred in its decision filed in the said cause and dated April 22, 1933." 6. "The court erred in holding and deciding in its said decision that the sale of the business and assets of the New York Dress Company, Limited, to C. T. Davenport should be canceled and set aside." 7. "The court erred in holding and deciding in its said decision that the sale by C. T. Davenport of properties theretofore purchased by him from the assignee for creditors of the New York Dress Company, Limited, should be set aside." 9. "The court erred in reaching the conclusion of law announced as follows in its said decision: 'The law is clear to the effect that the sale here in question must be set

aside.' " 21. "The court erred in its said decision in holding and deciding that the petitioner V. D. Doty had a valid claim and status as petitioner in said cause as a creditor of the New York Dress Company, Limited." 26. "The court erred in making and entering its interlocutory decree on, to-wit, the first day of May, 1933." 43. "The court erred in failing to consider and act upon uncontradicted evidence offered in support of said exceptions to said master's report." 75. "The court erred in making and entering its said final decree in that said decree fails to do equity." 80. "The court erred in not giving judgment for respondents in said cause." Cases under which similar or analogous assignments have been held to be defective are: *Zen* v. *Koon Chan*, 27 Haw. 369; *Estate of Malani*, 29 Haw. 713; *Smith* v. *Laamea*, 29 Haw. 750; *Kaohelelani* v. *Bishop Trust Co.*, 31 Haw. 357; *Nawahi* v. *First Trust Company of Hilo*, 31 Haw. 958, and *Lemes* v. *Lusitana Society*, 32 Haw. 522.

Respondents' method of presentation of assignments in their briefs is in part as follows: After their statement of the case is a "Specification of Errors Relied on" under six main headings alphabetically designated. Specification A contains nine subheads, the last of which is divided into two more. Specification F contains seven subheads. At the close of each subspecification, in parentheses appears a list of the assignments of error in which the specification is claimed to have been presented. Specification A, with its first subhead, is a fair example: "A. First: That error was committed in granting and decreeing cancellation at all for the following reasons: I. Because it appears that statu quo cannot be restored. (Assignments of Error Nos. IX, X, XIV, XV, XVI, XVII, XX, XXIX, XXX, LXV, LXVI, and LXXV.)" Assignment number nine, the first one thus relied upon, is one of the extreme examples of defective assignments here-

inabove quoted at length. Other specifications refer to assignments hereinabove held to be defective. The presentation in briefs and argument does not afford a check of the assignments referred to in the specifications to show which assignments do and which do not sufficiently present the points specified. In the circumstances this court cannot be required to make the check. For an analogy under a former United States Statute and Rule 9 of the United States Supreme Court, see *Local 167* v. *United States,* 291 U. S. 293, 296. There are, however, certain obvious substantial errors in the interlocutory and final decrees of the circuit judge which are sufficiently presented by assignment to require consideration.

From the foregoing recital it is apparent that the cancellation of the two sales above referred to was decreed, not to effect a restoration of the specific trust *res* or of property to which it could be traced but as a basis of the money decree which followed. No such restoration was ordered. None was found to have been possible. The money decree of $8,377.30 did not purport to be based upon evidence introduced either in court or before the master. It is based upon a recital that the report of the master "reveals that the value of the trust estate on May 13, 1933, was * * * $8,377.30." The report of the master, however, contains no such revelation. The master made no attempt to segregate and follow the trust *res* or to account for the sales thereof or the profits or losses upon the same. No evidence in this respect was taken by the judge or the master. What the latter did was to analyze the books of the New York Dress Company, Limited, as of February 1, 1932, and the books of the New York Dress Shop, under Davenport's ownership, as of March 1, 1932, and the books of the C & D Dress Company, Limited, as of December 31, 1932, and May 13, 1933. The balance sheet of the New York Dress Company, Limited, thus taken, as

of February 1, 1932, shows a net worth of corporate assets of that concern on that day of $2254.84. That is the exact amount which Davenport paid for them in addition to assuming Cadinha's liabilities as assignee in the further sum of $24,351.26; and $2254.84 is the amount which Cadinha distributed to the creditors of the New York Dress Company, Limited.

The next balance sheet is of the New York Dress Shop under Davenport's ownership, dated March 1, 1932, in which the assets just balance the liabilities. The C & D Dress Company, Limited, was incorporated March 4, 1932, with a capital of $1000, divided into fifty shares of $20 each. The transfer of the business from Davenport to the C & D Dress Company, Limited, occurred March 5, 1932. On March 9, 1932, the capital of the corporation last above named was increased from $1000 to $25,000 by the issuance of twelve thousand shares of $20 each. The capital stock was fully subscribed and was paid in to the extent of $24,980. The subsequent balance sheets and profit and loss statements of the C & D Dress Company, Limited, necessarily deal with an enlarged business done upon this new capital and with new credit. The balance sheet of the New York Dress Company, Limited, as of February 1, 1932, shows a merchandise inventory of $17,713.-30. The profit and loss statements of the New York Dress Shop and C & D Dress Company, Limited, to May 13, 1933, show purchases of merchandise aggregating $116,286.67, and sales to the amount of $159,771.89. Net losses from March 1, 1932, to May 13, 1933 (Exhibits 5 and 7), were $1315.49.

The statements of May 13, 1933, have been subjected to an "adjustment" set forth on page 24 (record p. 200) of the master's report, wherein items of operating expense and other charges to the aggregate amount of $8,242.79 have been added back leaving what the master terms a

"balance of surplus" in the sum of $6,927.30. This same last-named amount is referred to in the master's Exhibit 8 as "net worth" and in Exhibit 9 as "net profit" and is the basis of the trial judge's finding of value. The latter finding is reached by adding to the master's total of $6,927.30 two items, namely, $1200 paid to Mrs. Davenport for services rendered the C & D Dress Company as buyer, and $250, alleged to have been paid for services in connection with the disincorporation of the New York Dress Company, Limited, as an attorney's fee. The total of the three items last above named is $8,377.30, the value found by the trial judge and the principal sum for which his monetary decree was given.

The expenses thus surcharged were expenses of the business enlarged as above set forth. If proper in other respects they were deductible from the gross operating profits of the business. If they exceeded such gross operating profits, as the master's exhibits show to have been the case, there could have been no net profit to be distributed in any proportion or in any event to the creditors of the New York Dress Company, Limited. Where a trustee wrongfully misappropriates trust funds, which he then mingles with moneys of his own to invest in other properties, it has been held in an equitable proceeding to establish the beneficiary's interest that the wronged beneficiary is entitled to recover his proportionate part of the profits made in the transaction. See *Primeau* v. *Granfield*, 184 Fed. 480, opinion by Learned Hand, D. J. In the opinion last above cited Judge Hand said: "I do not find a single case, and I have read a great many, in which the plaintiff's claim for a proportionate profit was disallowed when there were profits to get, and he claimed profits instead of his money with interest." A rule similar in effect was announced in *City of Lincoln* v. *Morrison*, 90 N. W. 905, in the opinion of Roscoe Pound then com-

missioner of the supreme court of Nebraska and now dean of the Harvard Law School. It is thus succinctly set forth in the syllabus: "In order to obtain a preference, cestui que trust must show that the estate out of which he claims such preference has been increased to some extent by the misappropriation of the trust property, and he is entitled to a preference to the extent of such increase only." See also the opinion of Judge Parker of the fourth circuit court of appeals in *Ellerbe* v. *Studebaker Corporation*, 21 F. (2d) 993.

In *Primeau* v. *Granfield, supra,* in computing profits it was held that "even a defaulting trustee is allowed for beneficial expenditures." To the same effect is *Harris* v. *Hensley*, 256 Pac. 832. In the instant case, among the expenditures disallowed was an item of $5,070 representing the manager's salary for the period of approximately fifteen and one-half months, covered by Exhibit 9 of the master's report. Other items included costs of incorporation, insurance, attorneys' fees and interest. None of them are shown to have been unnecessary or exorbitant in amount. This applies also to the first of the two items ($1200 for buyer's services) added by the circuit judge. As to the second item so added, namely, $250 for attorneys' fees, the amount actually paid was shown without contradiction to have been $150, and this does not appear to have been an unnecessary or exorbitant charge. The master's "adjustment" of profits therefore was not based upon sound legal principles and the judge was in error in adopting the balance shown in that adjustment as the measure of recovery against respondents. The error last above named is covered by assignments 68, 73 and 90 heretofore, upon motion to dismiss, held to be sufficient. Assignment 68 is among those relied upon as set forth in specification A-IV. Assignments 73 and 90 are relied upon as set forth in specification B-II. Assignment 67 has also

heretofore been held to be sufficient in form and is relied upon in specification A-IV.

Assignments 67 and 68 further allege error in the court's decree that the entire amount found due as aforesaid be paid to three only of the many creditors of the New York Dress Company, Limited. The other creditors have not been made and have not become parties to this proceeding and their rights in the premises cannot be foreclosed by any opinion herein expressed regarding them. As hereinabove set forth the answer alleges that the other creditors have refused to become parties hereto and that they are fully satisfied with the reported transactions of the assignee. This allegation is at least in part supported by proof. In these circumstances and in view of the fact that it does not yet appear that there are any assets or profits to be divided no opinion is now expressed as to the proper rate of any hypothetical recovery or distribution. This question and the further question of what disposition upon an accounting shall be made of the dividends heretofore paid to and retained by the three petitioners and the other creditors are left to be decided by the circuit judge, if properly presented by the facts, upon a new trial.

Other assignments require consideration. Assignment 63, heretofore held to be sufficient in form and relied upon as set forth in specification B-IX-2, is as follows: "The court erred in its said final decree in giving judgment against respondents for a sum of $250.00 as representing moneys actually paid as an attorney's fee in connection with the dissolution of the New York Dress Company, Limited, when in fact only $150.00 was paid for such purpose, and when nothing in the evidence or in the master's report justified any judgment against respondents in this connection at all." As hereinbefore indicated assignment 63 is well taken and it is sustained.

Another assignment (LVIII) averred error in the court's awarding attorney's fees in the sum of $2000 to the petitioners. "The general rule requires each party to the litigation to pay his own counsel fees. Attorneys' fees are not allowable in the absence of a statute or in the absence of some agreement or stipulation specially authorizing the allowance thereof; and it has been held that the rule applies equally in courts of law and in courts of equity." 15 C. J., subject "Costs," p. 114. "Apart from the sums allowable and taxed as costs, there can, as a general rule, be no recovery as damages of the costs and expenses of litigation, or expenditures for counsel fees." 17 C. J., subject "Damages," Par. 133, p. 807, and cases cited in footnote 78. See also *Oelrichs* v. *Spain,* 15 Wall. (82 U. S.) 211, 231; *Fraser* v. *Cole,* 214 Fed. 556, and *Young Chun* v. *Robinson,* 21 Haw. 368, cited in footnote 88 of 15 C. J. 114, above quoted. No counsel fees are provided by stipulation or agreement in the case at bar and no statutory authority exists in this jurisdiction for the awarding of attorneys' fees in gross, either as costs or as damages, to a successful litigant in a suit for cancellation.

In opposition to assignment 58 as to attorneys' fees petitioners cite the following Hawaii cases: *Hitchcock* v. *Hustace,* 14 Haw. 232; *Fitchie* v. *Brown,* 19 Haw. 415; *von Holt* v. *Williamson,* 23 Haw. 245; *Evans* v. *Garvie,* 23 Haw. 694; *Valentin* v. *Brunette,* 26 Haw. 498; *Guardianship Richard Smart,* 32 Haw. 943.

In *Hitchcock* v. *Hustace, supra,* it is true counsel fees were awarded the successful petitioners in a stockholders' suit in equity to recover from the promoters of a corporation cash and shares of stock alleged to have been retained by them as secret profits. But the record in that case discloses that the decree appealed from declared the counsel fees thus awarded to be a charge upon the cash and

stock therein decreed to be paid and delivered to the corporation and not an additional charge upon the respondents. No question as to the legality or illegality of the award is shown by the above-cited report to have been presented to or decided by this court. The amount of the fee, which this court reduced from $20,000, awarded by the circuit judge, to $7,500, is the only question in respect to the fee which this court is thus shown to have discussed or determined.

In *Fitchie* v. *Brown, supra*, costs were allowed the appellant heirs out of the funds of the estate in a contest concerning the construction of a will. When judicial construction of a will is required, benefit to the estate under the exceptional circumstances referred to in the opinion last above cited may justify the allowance of attorneys' fees payable by the estate. This case is not a precedent for the allowance of attorneys' fees generally to successful petitioners in equity.

In *von Holt* v. *Williamson, supra*, referring to *Fitchie* v. *Brown, supra*, this court said (23 Haw. 249) : "We do not consider the decision in that case as an authority generally for the payment of counsels' fees for diverse claimants to a particular fund out of the principal trust fund, and, therefore, as not controlling here." Claimant's motion for attorneys' fees out of the corpus of the trust estate was denied. The decision does not even inferentially support petitioners' contention in the case at bar.

*Evans* v. *Garvie, supra*, quoting from the syllabus: "Where conflicting interests of beneficiaries under a trust require the institution of a suit in order to determine the proper disposition of certain funds, and the litigation is for the general benefit of the parties interested in the trust, reasonable fees may be allowed to be paid to counsel for the respective parties out of the corpus of the trust estate." Quoting from the text of the case last above cited

(p. 695) : "The circumstances of this case are different from those involved in *von Holt* v. *Williamson, ante* p. 245, where the successful party established a right to certain income by way of a resulting trust, and in which claims of counsel for fees were disallowed. The decision in that case is consistent with the view that where litigation is in advancement of, and not in opposition to, the interests of all the beneficiaries of a trust counsel fees may be allowed to be paid out of the corpus of the trust fund." The principle above invoked . is not applicable in the case at bar where attorneys' fees are sought, not out of a trust fund but as an additional charge upon the respondents.

*Valentin* v. *Brunette, supra,* can be differentiated from the present case in the same way as *Evans* v. *Garvie, supra,* to which it referred. It was a proceeding in equity by trustees for instructions. Quoting from the text (26 Haw. 499) : "The appearance of the life-tenants and the remaindermen was made necessary by the uncertainty of the trustees as to their duty in the premises and by their petition for instructions. The appearance of these parties, with their conflicting claims, their evidence and their arguments, was of assistance to the court in its determination of the duty of the trustees. In other words, the proceeding was for the benefit of the estate and in the interest of all parties concerned."

In *Guardianship of Richard Smart, supra,* certain items of a retiring guardian's annual account were challenged by the successor guardian and the ensuing litigation resulted in the approval of some of the items and disapproval of others. Part of the fee of the retiring guardian's attorneys was allowed out of the funds of the estate. No claim is reported on the part of the successor guardian that the latter was entitled to a decree for the amount of his own fees against the retiring guardian.

The case is not authority for the proposition for which it is cited. Assignment 58 is sustained.

Assignment 74 is that "the court erred in its said final decree in rendering judgment against the United States Fidelity and Guaranty Company in the amount of $10,000.00." The United States Fidelity and Guaranty Company is not a party to the present proceeding. The record does not disclose that the respondents are in any way aggrieved or prejudiced by the part of the decree referred to in said last-named assignment. The rule applicable in the premises is thus stated in 3 C. J., p. 629: " * * * It is necessary, in order to maintain an appeal or writ of error, that appellant or plaintiff in error shall be injuriously affected or aggrieved by the judgment, order, or decree complained of, so that one cannot appeal from a decision, however erroneous, which does not affect his substantial rights." This court has held, quoting from *Hawaiian Trust Co.* v. *Holt*, 24 Haw. 212, 215, that "a party to a suit cannot appeal from a decree therein rendered if he is not thereby affected." To the same effect is *Castle* v. *Irwin*, 25 Haw. 786, 790. The two cases last above cited deal with appeals but the rule therein adopted applies with equal force to writs of error. As to the application of the rule to facts similar to those before us it was held in *Daniel* v. *Daniel*, 39 Ark. 266 (quoting from the syllabus) that "it is error to render judgment upon the dissolution of an injunction, against the sureties in the injunction bond, but the judgment will not be reversed upon the appeal of the principal alone." In *Butterworth & Lowe* v. *Cathcart*, 168 Ala. 262, 52 So. 896, it was held (quoting from the syllabus) : "A plaintiff is not prejudiced by an improvident order directing execution for costs against its sureties, and hence has no right to complain on appeal." See also *Cuyler* v. *Moreland*, 6 Paige 273, and *Larimore* v. *Parker*, 109 Kans. 66, 197 Pac. 1118. Follow-

ing the precedents above cited, so far as herein applicable, we hold that assignment 74 is not sustainable for the reason that the plaintiffs in error are not detrimentally affected by the part of the decree therein referred to.

Assignments 10 and 25 allege error in portions of the trial judge's decision as to proof of actual and constructive fraud and of conspiracy on the part of the respondents in making the transfers hereinabove referred to. Section 2524, R. L. 1925, provided in part with reference to review upon writ of error that "there shall be no reversal * * * for any finding depending on the credibility of witnesses or the weight of evidence." Four cases in which assignments of error were refused consideration under the foregoing statute are relied upon by petitioners as applicable in the premises. They are *Nawahi* v. *Trust Co.*, 31 Haw. 958; *Grosjean* v. *Hiyama*, 28 Haw. 211; *Hewahewa* v. *Lalakea*, 27 Haw. 544, and *Territory* v. *Gay*, 26 Haw. 382. Section 2524 was repealed by Act 42, L. 1931, which contains a substitute provision that there shall be no reversal "in any term case * * * for any finding depending on the credibility of witnesses or the weight of the evidence * * * unless such alleged error was made the subject of an exception noted at the time it was committed." What, if any, effect this later statute has upon petitioners' contention has not been argued and need not be decided. In any event we find no reason for disturbing the circuit judge's findings and conclusions referred to in this paragraph. Assignments 10 and 25 are not sustained.

Because of errors which injuriously affect the substantial rights of the respondents and which are covered by sufficient assignments as hereinabove decided, reversal of the trial judge's decree becomes necessary.

The question as to whether this court should finally dispose of the case or remand it with direction to the trial judge to grant a new trial then presents itself. Section

2536, R. L. 1925, as amended by Act 42, L. 1931 (now §
3563, R. L. 1935), provides in part: "The supreme court
may affirm, reverse or modify the order, judgment or sen-
tence of the trial court. It may enter such order, judg-
ment or sentence, or may remand the case to the trial court
for the entry of the same or for such other or further pro-
ceedings, as in its opinion the facts and law warrant. It
may correct any error appearing on the record." As to
the principles which should govern the choice of decree
under the statute last above quoted this court has ex-
pressed its opinion in the case of *In re Nelson,* 26 Haw.
809, on page 822, as follows: "Upon the evidence ad-
duced the judgment under review cannot stand. As to
whether judgment for the petitioner should now be en-
tered by this court (or directed to be entered in the court
below) or the cause be remanded for a new trial, it has
been held in this jurisdiction that 'if the court is of the
opinion that other evidence may be produced on a new
trial or is unable to say that such evidence may not be
produced, it will not render final judgment but will re-
mand the case for a new trial' and that 'before an appel-
late court can render final judgment on the reversal of
a judgment for insufficiency of the evidence it is not enough
that it appears improbable that the appellee will be able
to recover on a new trial, but it must appear that he can-
not.' *Territory* v. *Howell,* 25 Haw. 320, 325, 326. See
also 2 R. C. L. 282, Sec. 237, and 4 C. J. pp. 1185-1188."

In the instant case, as hereinabove set forth, faulty
methods of determining value and profit were employed.
The evidence was wholly insufficient to support the find-
ing of the trial judge in those two regards. The record,
however, does not indicate that proper evidence in this
respect cannot be supplied; and the law and the facts,
therefore, in our opinion warrant the granting of a new
trial.

484

The decree is reversed and the case remanded to the trial judge with instructions to grant a new trial.

*B. S. Ulrich* (also on the briefs) for plaintiffs in error.

*M. K. Ashford* (*F. E. Thompson* and *P. Silver* with her on the briefs) for defendants in error.